Brown, J.
This action was originally commenced by the plaintiff, as president of the Consolidated Stock & Petroleum Exchange, against the Commercial Telegram Company, to restrain that company from removing from the floor of the exchange certain printing telegraph instruments called “ tickers, ” by which instruments the quotations of sales of stocks, bonds, etc., on the New York Stock Exchange were transmitted to the plaintiff’s exchange. A temporary injunction was granted in the action, which "still remains in force.. No issue is made with the plaintiff by the answer of the telegram company upon any fact alleged as a basis of the relief sought, nor does that company dispute the propriety of that injunction, nor deny that the plaintiff is not entitled against it to the judgment asked for. Subsequent to the granting of the injunction against said company the defendant Smith, as president of the New York Stock Exchange, was made a defendant to the action, and upon allegations in the amended complaint, to the effect that the New York Stock Exchange threatened to prevent the said telegram company from furnishing to the plaintiff the information as to transactions on its floor, and to cut off its-wire and remove said company from its premises, an injunction was granted, restraining any such action on the part of said defendant.
The relief now sought by the judgment of this court is that the defendants-be perpetually enjoined from doing any act which will interfere with or prevent the plaintiff’s exchange from receiving the quotations of transactions on the New York Stock Exchange “as usually or regularly transmitted to the-public over and by means of the wires and instruments by the defendants, or any of them, maintained and used for that purpose,” and to perpetually enjoin the New York Stock Exchange from doing any act which will “interfere with, hinder, or delay the telegram company in collecting and distributing the said quotations as the usual and regular course of its business, and' furnishing the said consolidated exchange therewith.” I have quoted the-language of the prayer of the complaint, as it indicates what the pleader believes to be the rights, duties, and obligations of the several parties to each other in reference to the receipt and distribution of the transactions taking place upon the New York Stock Exchange; and it is very evident that that part of the relief which seeks to restrain the New York Exchange from removing the Commercial Telegram Company from its premises can be sustained only-on the ground that the business transacted upon such exchange is of such a character that any person has a right, not only by himself, but by his selected agents, to have access to, and be present on, the floor of the exchange at all times during the transaction of business there. While it is true that the complaint alleges a contract between the defendants under which the telegram company engaged in business upon the “floor” of the exchange, in collecting and transmitting by its “tickers” the quotations of transactions on said exchange, the evidence shows, without contradiction, that all reports and quotations of transactions upon the exchange were received by the telegram company for transmission to such persons only as should be approved of by such exchange, and that the “tickers” of said company were to be located in such places only as should be approved of by the exchange. There could *635 therefore be no claim of right to the possession of a ticker, or of a right to receive the quotations under their contract, without proof of approval of the exchange; and it is undisputed that such approval never was directly given-to locate tickers on the floor of the Consolidated Exchange, and that any such as might be inferred from knowledge or acquiescence was withdrawn by di-' rection of the telegram eompany'to remove their instruments.
Independent of the contract, the right of the plaintiff to have these quotations through the medium of the telegram company cannot be maintained; for, assuming that the Hew York Exchange is under an obligation to make public the prices at which stocks are sold on its floor, it has a right to control absolutely the channel through which such quotations shall be given out. It may, therefore, select one “ticker” company, and give to it all the privileges of collecting news on its floor, and exclude all others. Upon this question, The Express Cases, 117 U. S. 1, 6 Sup. Ct. Rep. 542, 628, is a direct authority. The obligation to admit to its floors all ticker companies could be no-greater than the obligation of a railroad company to carry all express companies. But in the case cited the supreme court held that the railroads were, not bound to carry all express companies, and on the same principle the stock exchange would be under no obligation to admit to its floor all ticker companies. Where would the line be drawn? If ticker companies have the right of admission to collect the quotations, individuals have the same. The exchange would swarm with outsiders, the rights of members be seriously impaired, and private property destroyed. Very slight reflection will convince any one that, if these quotations are to be given to the public, it must be under such reasonable regulations as the exchange should impose. I regard,therefore, as immaterial to the decision of the case, the fact that the Hew1 York Exchange had under consideration the making of a contract with the' Western Union Telegraph Company, by which it would bestow upon that-company the exclusive right of collecting the quotations of transactions on its- " floor, and excluding therefrom the Commercial Telegram Company and all-otliers, only so far as it contemplated limiting that company in the distribution of quotations to such persons as were designated by the exchange. If the making public the quotations of prices on its floor is a public duty, resting upon said exchange, it could not limit or control the designation of persons who should receive them. All would be entitled to them upon the same terms as they were generally given out, and the Western Union Company, or any other person or corporation that should be made the channel through-which the quotations would pass from the floor of the exchange to the public,could not discriminate in the distribution, but would rest under the public duty to serve all alike. If, however, no public duty rests upon the exchange-to make public the quotations of prices, then it may do with them as it pleases;serve one man and refuse another; and any person or corporation that it se-lects to distribute them, receives them solely as the agent of the exchange,- and can furnish them to such persons only as the exchange directs. The right-of every man to do what he will with his own, not interfering with the re-ciprocal rights of others, is accepted among the fundamental principles of our law.
We can also dismiss with a very brief reference the grounds of relief set-forth in the eleventh and fourteenth subdivisions of the complaint. Stripped* of all verbiage, the substance of those allegations is that substantially the-same class of securities are dealt in in both exchanges; that the Hew York-Exchange, by reason of its high business character, and the great amount of business done upon its floor, fixes the market value for such securities; that the members of the Consolidated Exchange cannot buy or sell such securities for their customers on the floor of their exchange, unless they know the quo= tations of prices ruling in the Hew York Exchange; and, unless they have means of promptly ascertaining the prices at which sales are there made, the *636 plaintiff will be seriously injured, and the value of membership in the Consolidated Exchange largely depreciated. In other words, unless some of the good-will which belongs to the Hew York Exchange, and which is the outgrowth of a long and honorable business career, and the high character of its members, and which makes valuable the membership in that exchange, is ■transferred to its business rival, it will be compelled to go out of business, and membership therein will be of little value. This is a most astonishing allegation upon which to found a public right. As well might one merchant demand to know the prices at which his rival in business sold his goods, on the ground that, unless he was informed of such prices, he could not compete with him in the market. Membership in the exchange is property of great value, which would be seriously impaired if persons not members could have access for any purpose to its floor, and especially to such important imformar tion as the prices ruling there at every moment of the day; and that no such right upon the grounds claimed in these allegations could be enforced, without violating the safeguards of the constitution relating to the enjoyment of liberty and property, is apparent, without argument.
We come, therefore, to the real question in the case, which is, does any public duty rest upon the Hew York Exchange to make known the prices of securities dealt in by members on its floor? The direct authorities upon this ■question are few. With the exception of the decisions that have been made in the litigation between the parties to this action, the only direct authorities to which I have been referred, or which I have been able to find, arose in the state of Illinois. In two" cases in the circuit court of that state it has been • decided that the Chicago Board of Trade could not exercise any discrimination as to who should receive its market quotations, or as to what telegram companies should be allowed facilities for distributing the information to the public. Stock Exchange v. Telegraph Co., reported in note to Bryant v. Telegraph Co., 17 Fed. Rep. 830; Murphy v. Board, 20 Chi. Leg. N. No.7. But in the case of Stock Exchange v. Board, in .the appellate court of the First* district of that state, directly the opposite was held, and an injunction against the board of trade was dissolved; the court holding that the board of trade was a private corporation, in whose affairs no one was especially interested ■ except its members, and that it had the right of discrimination in the distribution of its market reports. This decision affirmed an order of Justice Bagby, ■dissolving an injunction against the board of trade, and must be regarded as ■overruling the decision of Justice Collins in the Murphy Case, and Chancellor Tuley in Stock Exchange v. Telegraph Co. See Const. Ill. art. 11, § 6; 1 ■Gen. St. p. 702, § 28. To the same effect are the decisions of the circuit court ■of the United States. Bryant v. Telegraph Co., 17 Fed. Rep. 825; Stock Exchange v. Board, 15 Fed. Rep. 847; Stock Exchange v. Telegraph Co., 22 Fed. Rep. 25. In these cases it was held that the board of trade was-a private •corporation, and could give or withhold from the public its transactions, and that it might give the transactions to the public through such agents or upon •such conditions as the board may deem advisable. In this state we have the •decision of Justice Dykman, made on granting the temporary injunction in this action, against the stock exchange, holding the doctrine of the public ■character of the business of the exchange, and its duty to make public its ■transactions; and the decision of the general term of the First department, in the case of Telegram Co. v. Stock Exchange, 47 Hun, 494, holding the contrary doctrine, and that there was no duty on the defendant to make known the transactions taking place on its floor. The weight of judicial authority is ■■thus adverse to the plaintiff’s claim. The cases in the circuit court of Illinois, and also the decision of Justice Dykman, were based on the doctrine of Munn v. Illinois, 94 U. S. 130, in which it was held that property, when used in a manner to make it of public consequence and affect the community at large, became clothed with a public interest, and might be controlled by the *637 public for the common good, and the plaintiff’s Vhole argument is based on the doctrine in this case. I am unable to see how Munn v. Illinois has any application to the question involved in this case. That case arose under the-statute of Illinois regulating the use of elevators and warehouses in the city of Chicago, and which was enacted pursuant to the general police power of the legislature. The question presented to the court was as to the constitutionality of that law. But we are not dealing with any legislation in reference to the stock exchange or its property. Whether the legislature has the "power to control the stock business, and to require the exchange to make public their transactions, is not now a pertinent question. If such power does exist, it is among the police powers of the state. But the police powers do not reside in the courts, but in the legislature. The courts can enforce no-obligation against a citizen, except such as are imposed by law. We must therefore take the legal rights of the parties as we find them. The Munn Case decided nothing, except the power of the state to enact the law in question, and therefore every tiling said by the chief justice must be construed with reference to that fact. As was said by our court of appeals in Bertholf v. O’Reilly, 74 N Y. 523, in speaking of this case: “It may be deemed to have-carried the right of legislative interference with private rights and property to its utmost limit, but it illustrates the scope of the police power in legislation.” In the absence of any act of the legislature regulating the stock business, or imposing any public duty upon the New York Stock Exchange, we must therefore be guided solely by the common law in determining the rights and obligations of the parties; and I think it will not be disputed that, if any duty rests upon the stock exchange to make public the ruling price of transactions on its floor, such duty must be found either in the character of the organization or in the nature of the business there transacted.
1. As to the character of the organization. The New Y ork Stock Ex chan ge is not a corporation. It is a voluntary association of individuals, engaged in business as brokers in stocks, bonds, and other securities. It is not the outgrowth of any public demand, serves no public interest, has sought no special privileges or power, and has asked and obtained nothing from the state, except that protection which the law affords every citizen, and exists solely for the purpose of affording its members facilities for the transaction of their individual business. The nature of the organization is thus described by the court of appeals: “The New York Stock Exchange is a voluntary association of individuals, united, without a charter, in an organization for the purpose of affordingits members certain facilities for the transaction of their business as brokers in stocks and securities, and a convenient exchange or sales-room for the conduct of such transactions. It cannot be said to be strictly a copartnership, for its objects do not come within the definition of one. A copartnership results from a contract between the parties, by which they agree to combine their property or labor, or both, to some common enterprise, and for a common profit, to be shared in the proportion stated in their contract. The objects of a voluntary association of brokers do not, however, involve any such combination, or any communion of profits from the business transacted by the members. Like a business club, its principal object is the promotion of the convenience of its members, by furnishing facilities which aid them in doing their business, and are therefore of benefit to them.” In the exercise of its ordinary functions it does not usually engage in any business, except such as are incidental to furnishing proper and convenient facilities to its members. It is not interested in the business transacted between its members, and makes no sales or purchases of any securities dealt in within its walls, and is under no obligation to acquire any information as to any trans> action taking place there, or to ascertain the prices of any securities therein bought or sold. In all this there is plainly no public service, and in accomplishing the object and purpose of its organization no public duty.
*638 2. As to the business transacted upon the exchange, as already stated, in such business the exchange has no part and no interest. The business is ex clusively that of the individual members, and nothing, I take it, can be clearer •than that the parties to a sale of property have an absolute fight to keep the facts and details of that transaction to themselves, and to deny any informa-tion relating thereto to all the world; and that there is no power in the state .or courts, under our constitution, to compel them to make the same public. So that in all business transactions on the floor of the exchange, between its .members, there is no public service and no public duty, and no obligation rests upon any of the members of the exchange to make known any of the details of their transactions with other members, and that with respect to sales ■of bonds, stocks, and securities there is the same immunity from public inspection as exists in all branches of mercantile business. It appears, however, from the evidence, that for many years the exchange has permitted persons not members to have access to its floor, to ascertain and collect the reports of transactions taking place there, and that the information thus obtained is distributed as news all over the country. The manner in which this business is done is fully set forth in the findings, and need not be stated here. It is this fact which plaintiff claims gives a public character to the business, .and imposes a duty not to discriminate in the distribution of the reports. This might be an important fact to be considered by the state in determining whether the business should be brought under public control, but I am unable to see, and the argument of the counsel does not show, how it changes the legal rights of the parties. The exchange, as an association, stands in no different relation to the public in respect to their transactions than to individual members. Whatever it does it does by their direction. Its acts express simply the will of the majority. If there is any public duty growing out of the business of dealing in stocks and bonds, the obligation is greater upon the broker who sells than on the exchange. The exchange is but the agent of its members. Whatever information it possesses it holds in trust for its members, yet any member may refuse to make public his sales or purchases. How, then, can the exchange be compelled to make public that member’s business which he has a right to keep private? If, however, we regard the quotations as property which the exchange sells, the plaintiff’s case is no stronger. Undoubtedly, the ruling price of stocks is an important item of news, but no more so'than the price of other commodities; and the exchange, in selling it as a species of property, bears no different relation to the public than any other merchant who offers his wares in the market. The price of stock is of no more importance to the public than the price of coal or grain or any other necessaries of life. But must the coal merchant or grain dealer sell his goods to whomsoever tenders him the price? Cannot the merchant select his customer, the lawyer his client, and the physician his patient? It seems hardly necessary to cite authorities upon such a question, yet a few references may not be out of place. The main guaranty of private rights is found in the provisions of the bill of rights, that no person shall “be deprived of life, liberty, or property without due process of law.” In commenting on this provision in Bertholf v. O'Reilly, the court of appeals say “The right to life includes the right of the individual to his body in its completeness, and without dismemberment; the right to liberty, the right to exercise his faculties, and to follow a lawful avocation for the support of life; the right of property, the right to acquire power, and enjoy it, in any way consistent with the equal rights of others, and the just exactions and demands of the state.” In Re Jacobs, 98 H. Y. 98, Earl, J., says: “Liberty, in its broad sense, as understood in this country, means the right, not only of freedom from actual servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to *639 pursue any lawful trade or avocation. All laws, therefore, which impair these rights, which limit one in his class of trade or profession, or confine him to work or live in a specified locality, or restrain his otherwise lawful movements, except such as may be passed in the exercise by the legislature of the police power, are infringements upon his fundamental rights of liberty. ” “ The exclusive right of using and transferring property follows, as a natural consequence, from the perception and admission of the right itself.” 2 Kent Comm. (3d Ed.) 320. “Every man has a right to determine what branch of business he will pursue, and to make his own contract with whom he pleases, and in the best terms he can. He may refuse to' deal with any man or set of men; and it is no crime for any number of persons, without an unlawful object in view, to associate themselves together, and agree that they will not work for or deal with certain men or classes of men, or work under a certain price, or without certain conditions.” Carew v. Rutherford, 106 Mass. 14. “In general, every person may make rules for the regulation of his own business, and may deal with whomsoever he pleases, and refuse to deal with others. ” Cooley, Const. Law, 232. So long as he violates no law, and does not interfere with the reciprocal rights of others, every man may do what he. will with his own. He may engage in any lawful business or occupation, and he may sell his own goods or refuse to sell to whomsoever he chooses. The obligation of the stock exchange with reference to the transactions between its members, arising from the fact that it collects and sells the quotations, can be no greater than the obligations resting on any other merchant to make known the price of his goods. To take an illustration from the evidence in this case: It appears that the Associated Press collects the quotations on the exchange as items of news, as it does other news, from the whole world, and sells them to the newspapers throughout the country Is that association under apublic duty to sell news collected by it to every newspaper that demands it, and offers to pay the usual price? Cannot it select its customers, and sell to one paper in Hew York, and refuse one in Brooklyn ? Undoubtedly it can, and yet its business is affected with a public interest to •a much greater extent than that of the stock exchange, as one sells the quotations of stocks, but the other reports the news to the world. The theory that everything which a large part of the community is interested to know is therefore affected with a “public interest,” as that term is used in the decisions of the courts, is a very erroneous one. A business of a private individual, when affected with a public interest, must not only include facts which the people are entitled to know, but its object must be public accommodation, or it must concern something which the state has power to regulate or control. Judge Cooley, who is among the ablest writers on the subject of constitutional law, after a careful review of the Munn Case, gives his conclusion on this subject as follows: “In the following cases we should say that property in business was affected with a public interest—First, when the business is one the following of which is not of right, but is permitted by the state as a privilege; second, when the state, on public ground, renders the business special assistance by taxation or otherwise; third, when, for the accommodation of the business, some special use is allowed to be made of public property or of a public easement; fourth, when exclusive privileges are granted in consideration of some special return to be made to the public.” Const. Lim. 739. There is nothing in the organization of the Hew York Stock Exchange or its business that could be brought within the classes named by Judge Cooley. Heither the organization nor the business of the members, nor the business of collecting and distributing the quotations of the prices of stocks sold within its walls, partakes of a public character. The association is private, and the business is between private individuals, and it follows that no person not a member can enforce any right therein, except such as he may obtain by contract. Applying this conclusion to the *640 parties to this case, the plaintiff has shown no cause of action against the-stock exchange, and as to it the complaint must be dismissed. But no issue-is made by the answer of the telegram company, and as to if an injunction must be granted in accordance with the prayer of the complaint.