[L. A. No. 12757. In Bank.—July 31, 1931.]

J. EARL JARDINE, Petitioner, v. SUPERIOR COURT OF LOS ANGELES COUNTY et al., Respondents.

Loeb, Walker & Loeb and O'Melveny, Tuller & Myers, for Petitioner.

Joseph L. Lewinson and Hewitt, McCormick & Crump for Respondents.

LANGDON, J.—This is an application for a writ of prohibition. On or about October 8, 1929, Arthur M. Loeb and others, alleging themselves to be minority stockholders of Sunset Pacific Corporation and acting on behalf of said corporation in a representative suit, brought an action in the Superior Court of Los Angeles County against various defendants. It was alleged in the complaint that on April 15, 1929, all property and assets of Julian Petroleum Corporation were assigned to Sunset Pacific Corporation upon its purchase of the same at a sale held by the United States District Court on October 15, 1928, pursuant to a plan of reorganization of the company. It was further alleged that the defendant Jacob Berman formed a general scheme to defraud the Julian Petroleum Corporation and its stockholders by the issuance and sale of void certificates of stock; and that he did so with the aid of other defendants, who had notice of the fraudulent character of his acts. The prayer was for an accounting of all profits realized from the sale of such securities and for general equitable relief.

The complaint and summons named as defendants "Los Angeles Stock Exchange, a nonprofit and unincorporated association", and a number of individuals, some of whom were members of the association and others were not. Of the total membership of the Exchange, only a small group were named, and they were specifically alleged to have individually participated in the fraudulent acts. Copies of the complaint and summons were served upon the association and its president, various individual defendants named in the complaint and summons, and some members of the Exchange who were not named in the complaint or summons. All of the defendants made special appearances, to object to the jurisdiction of the court by motion to quash the summons. A hearing was had on affidavits and exhibits offered by the parties, and all of the motions were denied. Thereafter applications for writs of prohibition were made to the District Court of Appeal, Second Appellate District, Division Two. That court denied the applications made on behalf of the Exchange and individuals who were named in

the complaint and summons; and granted the writ as to those persons who, as members of the Exchange, were served with process though not named in the complaint or summons. No attack is made upon the decision of the said District Court of Appeal in so far as it applies to the individual defendants. A hearing in this court was granted, however, to consider further the application made by petitioner, J. Earl Jardine, president of the Los Angeles Stock Exchange, on behalf of the Exchange. It may be noted that the Exchange itself appeared in its association name to file its motion to quash summons, but upon the denial of said motion, took no further steps on its own behalf. However, we attach no significance to this circumstance. The sole problem before us is whether the lower court has acquired jurisdiction over said defendant Los Angeles Stock Exchange.

The solution of the problem depends upon the meaning and validity of section 388 of the Code of Civil Procedure, which reads as follows:

"When two or more persons, *associated in any business, transact such business under a common name,* whether it comprises the names of such persons or not, *the associates may be sued by such common name,* the summons in such cases being *served on one or more of the associates;* and the judgment in the action shall bind the *joint property* of all the associates, and the individual property of the party or parties served with process, *in the same manner as if all had been named defendants* and had been sued upon *their joint liability.*"

Petitioner contends that the Los Angeles Stock Exchange does not come within the terms of this statute; and further contends that it is an unconstitutional denial of due process of law.

Before proceeding to a consideration of these contentions, it is necessary first to determine whether they are properly raised in this application for a writ of prohibition. It is argued by counsel for the plaintiffs in the original action, who appear herein as counsel for respondent Superior Court, that the nature of the activities of the Exchange was a question of fact which was presented to the trial court on motion to quash summons; that the said court had before it affidavits and exhibits describing the work of the Ex-

change and containing conflicting statements and conclusions; and that on this conflict as to the facts the court rendered a decision which is conclusive and not subject to attack by writ of prohibition. We cannot view the situation in this light. The questions of fact relate to jurisdiction over the defendant, and are connected with a question of law—the meaning and constitutionality of a statute. The trial court necessarily considered facts, but also made a determination of the legal question, which determination is obviously not conclusive. ▋ Respondents' chief objection to this proceeding is, however, that for any supposed error in the trial court's decision, the petitioner has an adequate remedy by appeal. This would, of course, require that judgment be permitted to go by default in the lower court; for if, after denial of the motion to quash, the defendant association answered and went to trial on the merits, it would waive its right to raise the jurisdictional question on appeal. If "a defendant wishes to insist upon the objection that he is not in court for want of jurisdiction over his person, he must specially appear for that purpose only, and must keep out for all purposes except to make that objection". (*Olcese* v. *Justice's Court,* 156 Cal. 82, 87 [103 Pac. 317, 319].) "By answering and going to trial on the merits, the defendant made a general appearance and submitted itself to the jurisdiction of the court. It thereby waived any right it may have had to insist that jurisdiction of its person had not been obtained." (*Remsberg* v. *Hackney Mfg. Co.,* 174 Cal. 799, 801 [164 Pac. 792, 793].) Hence, respondents' contention amounts to this: Petitioner must either give up the right to contest jurisdiction or to defend on the merits of the case; that while both rights are given by the law, only one can be exercised. Curiously enough, there are a number of decisions in this state which hold that the remedy of a defendant who attacks jurisdiction over his person is by appeal only. (See *Germain Seed etc. Co.* v. *Justice's Court,* 41 Cal. App. 397 [182 Pac. 784]; *Lumas Film Corp.* v. *Superior Court,* 89 Cal. App. 384 [264 Pac. 792]; *Bullard* v. *Superior Court,* 106 Cal. App. 513 [288 Pac. 629], and cases cited.) These cases fail to distinguish between jurisdiction over the subject matter and the person, and seem to overlook the dilemma in which their holdings place the defendant who objects to

jurisdiction over his person. There was a time when such a rule would have been perfectly reasonable, for the view of some of the earlier cases in this state was that a defense on the merits was not a waiver of the right to raise the jurisdictional question on appeal. These cases were disapproved in later decisions, of which *Remsberg* v. *Hackney Mfg. Co., supra,* is typical, and there is now no sound basis for the view contended for by respondent. The correct rule is, we think, set forth in *Westinghouse Elec. & Mfg. Co.* v. *Justice's Court,* 79 Cal. App. 759 [250 Pac. 1104, 1105], where the court, after distinguishing and criticising other cases, said (p. 761) : "It is apparent, therefore, if prohibition will not lie in this case the petitioner here must waive either the lack of jurisdiction and submit to the jurisdiction of the court, or stand upon the defense of lack of jurisdiction and waive the defense on the merits. We do not think that the rule requires the petitioner to do either." Moreover, the existence of a remedy by appeal does not prevent the use of prohibition where the remedy by appeal is not adequate or speedy. The writ is sought here not only for the reason just discussed but for the additional reason that a decision in favor of petitioner on the jurisdictional question would avoid the delay and expense of a protracted trial. This factor has frequently influenced this court to determine a jurisdictional point on petition for writ of prohibition. (*Department of Public Works* v. *Superior Court,* 197 Cal. 215 [239 Pac. 1076] ; *A. G. Col Co.* v. *Superior Court,* 196 Cal. 604 [238 Pac. 926] ; *Davis* v. *Superior Court,* 184 Cal. 691 [195 Pac. 390] ; see, also, *Chaplin* v. *Superior Court,* 81 Cal. App. 367 [253 Pac. 954] ; *Knox* v. *Superior Court,* 100 Cal. App. 452 [280 Pac. 375].)

We conclude that the jurisdictional question was properly raised by this petition; and since this conclusion is in direct conflict with the group of cases to which reference has been made (*Bullard* v. *Superior Court, supra,* and others cited *supra*) we are compelled to overrule them in so far as they purport to hold that an objection to jurisdiction over the person of a defendant cannot be raised by an application for a writ of prohibition.

This brings us to the argument of petitioner, and we direct our inquiry first to the constitutionality of section 388 of the Code of Civil Procedure. This section was

enacted as a part of the original code, and is substantially the same as section 656 of the Practice Act. It provides that the judgment in an action brought under it against members of an association shall bind (1) the joint property of all the associates, and (2) the individual property of the party or parties served with process. This latter provision as to individual property was added by amendment of the statute in 1907. Petitioner contends that both parts are unconstitutional, and respondent makes no argument as to the validity of the 1907 amendment, on the ground that if the first part be sustained, a valid judgment can be rendered and the extent of the enforcement of that judgment is of no consequence at this time. We are satisfied that the provisions are severable, and that respondents' position is sound. A discussion of the power to enforce such a judgment against individual property of members served with process is wholly immaterial in this proceeding, and we express no opinion on the point.

The only authority which has been cited to the point that section 388 is unconstitutional is *Tay, Brooks & Backus* v. *Hawley,* 39 Cal. 93, where the court made certain statements with respect to the constitutionality of section 32 of the Practice Act. The particular provision was that in an action against "defendants jointly indebted upon a contract", where summons was served on one or more, but not all of them, the judgment might be enforced against "the joint property of all". The court was of the opinion that to take even the joint interest in property of a defendant not served was a denial of due process of law. It may be observed that the case deals with section 32 and not section 656 of the Practice Act. Section 32 now appears, without the provision commented upon, as section 414 of the Code of Civil Procedure. In *Davidson* v. *Knox,* 67 Cal. 143 [7 Pac. 413], it was said that this provision was eliminated as a consequence of the declaration in *Tay, Brooks & Backus* v. *Hawley, supra.* But no similar change was made when section 656 of the Practice Act became section 388 of the Code of Civil Procedure, and there is an obvious and decided difference between an attempt to bind the joint property of *joint debtors under a contract,* and that of *members of an association.* Whether the conclusion of the court in *Tay, Brooks & Backus* v. *Hawley, supra,* as to joint debtors is correct, is a question which does not bear upon the problem

involved in the instant case, though it may be remarked in passing that the case apparently stands alone in the United States in its expressions on this point. (Warren, Corporate Advantages Without Incorporation, p. 243.) Moreover, the facts of the case did not even present the problem discussed by the court, for only one defendant was involved, and he was served with process. The court made this clear when it said (39 Cal. 97): "This case might, perhaps, have been disposed of without noticing the question . . . ''

The validity of section 388 has not been directly passed upon in any case that we have found in our reports, although it has been frequently applied, as will hereinafter appear. A study of its origin and purpose should, however, remove any doubts which may have existed. For a long time the established rule was that in the absence of statute, an unincorporated association could not sue or be sued in its common name; all the members thereof had to appear in their own names as parties plaintiff or defendant. The basic reason was that the association was not, in the eyes of the law, a legal unit or entity, and had no legal capacity to become a party to an action. (*Baskins* v. *United Mine Workers*, 150 Ark. 398 [234 S. W. 464]; *Karges Furniture Co.* v. *Amalgamated Woodworkers' Union*, 165 Ind. 421 [6 Ann. Cas. 829, 2 L. R. A. (N. S.) 788, 75 N. E. 877]; *Pickett* v. *Walsh*, 192 Mass. 572 [116 Am. St. Rep. 272, 7 Ann. Cas. 638, 6 L. R. A. (N. S.) 1067, 78 N. E. 753]; *St. Paul Typothetae et al.* v. *St. Paul Bookbinder's Union*, 94 Minn. 351 [3 Ann. Cas. 695, 102 N. W. 725]; Warren, Corporate Advantages Without Incorporation, pp. 542, 668; Wrightington, Unincorporated Associations, 2d ed., pp. 136, 425; Sturges, Unincorporated Associations as Parties to Actions, 33 Yale L. J. 383; 5 C. J. 1365, 1369.) The difficulty was only one of procedure, and the objection was purely technical. The liabilities or rights of the members were in no way involved, and were not, in theory, impaired by the operation of the rule. They might have brought actions if they all joined as plaintiffs, and they might have been held to any liability imposed upon them by law, if sued and served individually. But where associations with large membership were involved, the operation of the rule frequently had inconveni-

ent and unjust consequences, and various exceptions came to be recognized. Thus, it is generally held that failure to raise the question of capacity is a waiver of the objection. And in suits in equity, courts have taken jurisdiction over all of the association members, though not all were made parties to the action, on a theory of representation. Likewise, where statutory recognition of the association as an entity has been found, suits have been permitted without any specific statute on the right to sue. (See *United Mine Workers* v. *Coronado Coal Co.*, 259 U. S. 344, 390 [27 A. L. R. 762, 66 L. Ed. 975, 42 Sup. Ct. Rep. 570, see, also, Rose's U. S. Notes]; Warren, *supra,* pp. 664, 669; Sturges, *supra,* 33 Yale L. J. 383; Dodd, Dogma and Practice in the Law of Associations, 42 Harv. L. Rev. 977, 1001.)

The many inconveniences of the rule were not wholly evaded by these exceptions, and statutes were widely adopted for the purpose of eliminating this procedural obstacle by permitting suits to be brought against the associates in the common or association name. In most instances, they did not give the association the right to appear as a *plaintiff*. The statutes dealt solely with the manner of bringing actions, and were not intended to effect any change in the substantive law. Members of associations had the same rights and were subject to the same liabilities as before, only now they could be sued by a less complicated and cumbersome process. The various state acts are classified and discussed in detail in Professor Warren's treatise (Corporate Advantages Without Incorporation, p. 542 et seq.).

Such statutes, whenever subjected to constitutional attack, have been uniformly sustained, not only as to partnerships but as to other unincorporated associations, including those not organized for profit. (*United States Heater Co.* v. *Iron Molders' Union,* 129 Mich. 354 [88 N. W. 889]; *Appeal of Baylor,* 93 S. C. 414 [77 S. E. 59]; *F. R. Patch Mfg. Co.* v. *Capeless,* 79 Vt. 1 [63 Atl. 938]; see, also, *Sugg* v. *Thornton,* 132 U. S. 524 [33 L. Ed. 447, 10 Sup. Ct. Rep. 163, see, also, Rose's U. S. Notes]; *Kittredge* v. *Grannis,* 244 N. Y. 182 [155 N. E. 93]; *Esteve Bros. & Co.* v. *Harrell,* (C. C. A.) 272 Fed. 382; *Thomas* v. *Nathan,* 65 Fla. 386 [62 South. 206]; *Brooks & Ellis* v. *McIntyre,* 4 Mich. 316; Wrightington, Unincorporated Associations, pp. 137,

436; note, 20 Harv. L. Rev. 58.) The court, in *United States Heater Co.* v. *Iron Molders' Union, supra,* spoke briefly and to the point when it said (129 Mich. 354 [88 N. W. 893]): "The law deals with conditions as they exist. It recognizes that there may be unincorporated voluntary associations, clubs, and societies in this state . . . and also that it may be necessary or desirable to make them defendants in an action at law or proceeding in chancery . . . It is for the legislature to determine who may sue and be sued, so long as it does not interfere with vested rights or deny any remedy. 'As a general rule, every state has complete control over the remedies which it offers its suitors in its courts. . . . And any rule or regulation in regard to the remedy which does not, under pretense of modifying or regulating it, take away or impair the right itself, cannot be regarded as beyond the proper province of legislation.' (Cooley, Const. Lim., 6th ed., 442.)"

In California, section 388 has been frequently applied without any questioning of its validity. The leading case is *Artana* v. *San Jose Scavenger Co.,* 181 Cal. 628 [185 Pac. 850, 851], which involved an action against a partnership in its common name, and the court said that a partnership was, for the purposes of the statute, "regarded as a legal entity distinct from its members". In *Armstrong* v. *Superior Court,* 173 Cal. 341 [159 Pac. 1176], the court briefly expressed the view that it was applicable to a labor union. A number of well-considered cases, hereinafter discussed, have dealt with its application to unincorporated associations of various kinds. They have all tacitly recognized the validity of the statute. Whether, for the purpose of the suit, the *unincorporated association* is to be considered an entity, or whether the statute merely permits an action to be brought against the *associates* in the name of the association, is a point upon which the decisions from other jurisdictions are not in agreement. In California, the entity theory has been established by a number of decisions. (*Artana* v. *San Jose Scavenger Co., supra; John Bollman Co.* v. *S. Bachman & Co.,* 16 Cal. App. 590 [117 Pac. 690, 122 Pac. 835]; *Craig* v. *San Fernando Furniture Co.,* 89 Cal. App. 167 [264 Pac. 784]; *Ferry* v. *North Pac. Stages et al.,* 112 Cal. App. 348 [296 Pac. 679]; see, also, *Gardiner* v. *Eclipse Grocery Co.,* 72 Mont. 540 [234 Pac.

490]; *Brotherhood of Railroad Trainmen* v. *Cook*, (Tex. Civ. App.) 221 S. W. 1049; *Warren, supra,* p. 249 et seq.) We think that it was unquestionably competent for the legislature to enact section 388, and that it is perfectly consistent with due process to provide that jurisdiction over an association doing business shall result from service upon one or more of its members. So far as constitutionality is concerned, we see no distinction between such a statute applied to partnerships and to other unincorporated associations.

We thus arrive at the problem of construction. We must determine whether the provisions of section 388 apply to the Los Angeles Stock Exchange. In brief, the question is whether the association transacts business.

The work of the Los Angeles Stock Exchange was described in the affidavits and exhibits filed with the trial court. The record before us is somewhat meager, but it appears to cover the important facts. From this record we learn that the Exchange is a voluntary unincorporated association of about sixty members, who pay dues to the association for the privilege. The personnel of the membership is constantly changing. The Exchange functions through trustees elected annually by the members. Members have no interest in the property of the association prior to its dissolution. The purposes of the Exchange, set forth in the constitution and by-laws, are, in part, to furnish rooms and other facilities for the transaction of their business by its members, as brokers; to operate a general Stock Exchange for the listing, calling, trading in, buying and selling of stocks, bonds and securities of all kinds, and for the sale and transfer of membership rights and privileges; to conduct a clearing house for the proper completion of any purchases or sales and the proper transfer and delivery of shares of stock, bonds and securities; to develop and extend the market for stocks, bonds and securities; to borrow and loan money, give and take security therefor, and to acquire by purchase or otherwise, own, hold, lease, enjoy, sell, convey and otherwise deal in and with real estate and interests therein and personal property; and generally to do any and all things necessary and proper in the conduct of the "business" and in the carrying out of the purposes of the association. In pursuance of these

objects, property of considerable value has been acquired by the Exchange, title to which is vested in the trustees. It appears that it has organized and controls "Los Angeles Stock Exchange Building Corporation", which was, at the time of this action, constructing an office building in Los Angeles, for the occupation of which rentals are to be charged and collected by the corporation. This and other activities are not limited to dealings between members. Thus, an escrow department is maintained, which is available to outsiders transferring securities, upon payment of the required fees. A charge is made to the corporations whose securities are listed on the Exchange. Memberships are sometimes sold by the association. An insurance fund is maintained for members. Through these various means the Exchange has collected and expended large sums of money, and now has, according to an affidavit on file with the trial court, an accumulated surplus of over a million dollars.

The above description sufficiently indicates the nature of the association involved herein. In its organization it is similar to other stock exchanges, since practically all were modeled after the New York Stock Exchange. The nature of such organization has been described in a number of cases. (See, generally, *Belton* v. *Hatch*, 109 N. Y. 593 [4 Am. St. Rep. 495, 17 N. E. 225]; *Wilson* v. *Commercial Telegram Co.*, 3 N. Y. Supp. 633; *People* v. *Feitner*, 167 N. Y. 1 [82 Am. St. Rep. 698, 60 N. E. 265]; *Citizens' Nat. Bank* v. *Durr*, 257 U. S. 99 [66 L. Ed. 149, 42 Sup. Ct. Rep. 15, see, also, Rose's U. S. Notes Supp.]; *Swift* v. *San Francisco Stock & Exchange Board*, 67 Cal. 567 [8 Pac. 94]; *Clute* v. *Loveland*, 68 Cal. 254 [9 Pac. 133]; *Hassey* v. *Ruggles*, 30 Cal. App. 19 [156 Pac. 989]; *Lowenberg* v. *Greenebaum*, 99 Cal. 162 [37 Am. St. Rep. 42, 21 L. R. A. 399, 33 Pac. 794]; Meyer, The Law of Stockbrokers and Stock Exchanges, p. 37.) But a glance at the earlier cases shows that much of the activity we find in the modern exchange is newly developed, and the old view of the institution as being merely a place where the members met to transact their business is far from correct to-day. For this and other reasons which will hereinafter appear, these cases are of little aid in dealing with the precise question before us. Our inquiry must necessarily

extend to unincorporated associations generally. And at the outset, it will be well to bear in mind the basic contention of petitioner, namely, that section 388 was designed to apply only to trading associations, engaged in some business for profit, the members of which incur joint liability in the transaction of the business, and that the stock exchange engages in no business, the business which goes on under its direction being solely the business of the individual members.

The decision upon which petitioner most strongly relies is *Swift* v. *San Francisco Stock & Exchange Board, supra.* In that case a suit was brought against the defendant association under section 388, and the lower court found that the Exchange was not an association engaged in business. Upon appeal, Mr. Justice McKee expressed his approval of the finding as follows: " . . . it is unquestionable that the main objects of the association are, the establishment of a mart for the sale and purchase of stocks and exchange by the members for their individual gain or loss, and the creation of a trust fund for the benefit of the surviving wife or children, etc., of deceased members . . . The collection of . . . fines, fees or dues does not constitute a business in which the members participate in the way of profit or loss as partners or otherwise . . . There are no profits earned to be divided among its members, nor are there any losses to be borne arising out of the acts of the joint body . . . I therefore think that the acts performed by the association in carrying out the purposes for which it was established, are not done in the transaction of a business carried on in the name of the association for the profit or loss of its members . . . all of these things, although in the nature of business, do not in themselves constitute a business for the transaction of which the members have associated themselves in the name of the association. They are merely incidental to the primary objects of the association."

*Warman Steel Casting Co.* v. *Redondo Beach Chamber of Commerce,* 34 Cal. App. 37 [166 Pac. 856, 857], is another case involving a suit against an unincorporated association, and contains similar language: "The association in this case was not one from which the members derived any specific individual profit or profit different from that which

would accrue to the municipal community. Its purpose was to promote the common welfare and it had no 'business' in the sense of being engaged in a private commercial enterprise.''

In *Cuzner* v. *California Club,* 155 Cal. 303 [20 L. R. A. (N. S.) 1095, 100 Pac. 868, 869], a suit was brought against the defendant, a social club, by a member thereof, to enjoin the selling of liquor in its clubrooms as a violation of an ordinance requiring the licensing of persons ''conducting, managing or carrying on the business of a retail liquor dealer''. An injunction was refused on the ground that the defendant was not engaged in that ''business''. After describing the organization and pointing out that the privilege was confined to members and their guests, and that the profits were used only for the social purposes of the club, the court said (p. 311 of 155 Cal.) : '' . . . in its transactions with its members in the carrying on of its club-house, looking simply to the giving to them such privileges in the property devoted to *bona fide* club purposes as they are all, in common, entitled to under the constitution and rules of the club, it is not engaged in business at all in the commercial or trade sense, as ordinarily understood''.

*St. Paul Typothetae et al.* v. *St. Paul Bookbinders' Union,* 94 Minn. 351 [3 Ann. Cas. 695, 102 N. W. 725] (quoted approvingly in *Warman Steel Casting Co.* v. *Redondo Beach Chamber of Commerce, supra*) was an action by one unincorporated association against another. The defendant was a labor union and the plaintiff was an employers' association. The court, construing the statute permitting suit in the common name, said: ''Its purpose was to authorize the courts to take jurisdiction over unincorporated associations engaged under a common name in some sort of business in which property is bought and sold, debts contracted—concerns owning and holding property, and incurring pecuniary liability . . . ''

The foregoing decisions are the strongest that have been found in support of petitioner's contention. To them may perhaps be added the case of *Lowenberg* v. *Greenebaum,* 99 Cal. 162 [37 Am. St. Rep. 42, 21 L. R. A. 399, 33 Pac. 794, 795], which says of the San Francisco Stock Exchange (p. 164 of 99 Cal.) : '' . . . it does not itself do any stock business, but its purpose is to afford facilities for its members

doing such business, each individually for himself''. Petitioner cites also the cases of *Hopkins* v. *United States,* 171 U. S. 578 [43 L. Ed. 290, 19 Sup. Ct. Rep. 40, see, also, Rose's U. S. Notes], and *People* v. *Feitner,* 167 N. Y. 1 [82 Am. St. Rep. 698, 60 N. E. 265].

An examination of these decisions shows that they are not all concerned with the power to sue unincorporated associations, and those which are not tend rather to confuse than to clarify the issue before us. The word "business" is a broad term which may be variously interpreted. (See *Easterbrook* v. *Hebrew Ladies' Orphan Soc.,* 85 Conn. 289 [41 L. R. A. (N. S.) 615, 82 Atl. 561].) This is made clear by the case of *Cuzner* v. *California Club, supra.* The holding was simply that the activities of the club did not constitute the carrying on of business as a retail liquor dealer, within the meaning of an ordinance imposing a tax upon such business. Moreover, Mr. Justice Angellotti uses language which is, we think, quite damaging to petitioner. He says (p. 311 of 155 Cal.) : "A *bona fide* social club, if permitted by its articles of incorporation or association, may, of course, so engage in business, either by transactions with its members or members of the public, as, for instance, by *letting for a consideration rooms* not used for the ordinary purposes of the club-house, or by *engaging in some outside enterprise for the purposes of realizing profits to be devoted to club purposes,* and so far as it does such things *even incidentally* for the purpose of realizing profit to be devoted solely to club purposes, it would be *engaged in business in the commercial sense* as fully as any person could be." (Italics ours.)

The case of *Lowenberg* v. *Greenebaum, supra,* held that the seat of a member of the San Francisco Stock Exchange was not taxable property. The same holding was made in *People* v. *Feitner, supra.* *Hopkins* v. *United States, supra,* held that the Kansas City Live Stock Exchange was not engaged in interstate commerce within the meaning of the federal regulatory statute. On the other hand, *Citizens Nat. Bank* v. *Durr,* 257 U. S. 99 [66 L. Ed. 149, 42 Sup. Ct. Rep. 15, see, also, Rose's U. S. Notes Supp.], held that the state of Ohio could levy a property tax on a resident, based upon his ownership of a membership in the New York Stock Exchange; and *Board of Trade* v. *Olsen,* 262 U. S. 1 [67

L. Ed. 839, 43 Sup. Ct. Rep. 470], held that the plaintiff, an incorporated grain exchange, doing no buying or selling of grain on its own behalf, was nevertheless conducting "a business affected with a public national interest" and subject to national regulation as such. In *State ex rel. Griffith* v. *Knights of the Ku Klux Klan*, 117 Kan. 564 [37 A. L. R. 1267, 232 Pac. 254], the defendant, a corporation with avowed benevolent and social purposes, was held subject to ouster as a foreign corporation doing business in the state. The same result was reached in *Knights of Ku Klux Klan* v. *Commonwealth*, 138 Va. 500 [122 S. E. 122]. *Pacific Typesetting Co.* v. *International Typographical Union*, 125 Wash. 273 [32 A. L. R. 767, 216 Pac. 358, 360], held that the defendant association, a labor union, the purpose of which was to secure better hours and working conditions for its members, was, when actively carrying out this purpose, doing business within the state. *In re Tidewater Coal Exchange*, 280 Fed. 638, held that a commodity exchange was an "unincorporated company" within the meaning of the Bankruptcy Act, and could be adjudicated a bankrupt. The court, after a discussion of its activities, decided that although it did no trading itself, it was nevertheless engaged in business. Wrightington (Unincorporated Associations, p. 294) remarks that the opinion in the Tidewater Coal Exchange case "implies the existence of a distinction between non-profit associations which are *adjuncts of commercial enterprise* and those whose functions are charitable, religious, educational or social", and that "for purposes of statutory regulation the distinction here foreshadowed will prove helpful". This brief review of cases discussing the general meaning of "business" emphasizes the necessity of construing our procedural statute in the light of the purpose of its enactment. (See *Superior Oil & Refining Syndicate* v. *Handley*, 99 Or. 146 [195 Pac. 159]; *Diamond* v. *Minnesota Sav. Bank*, 70 Minn. 298 [73 N. W. 182].)

Of the above-mentioned cases, even those which deal specifically with the power to sue an association do not, after careful study, stand as controlling authorities. *Swift* v. *San Francisco Stock & Exchange Board, supra,* was concerned with an action by executors of the estate of a deceased member of the Exchange to recover a sum of money pro-

vided as part of a system of insurance for members. For reasons not material here, the court decided that the executors were not entitled to recover, and Mr. Justice McKee's discussion of the power to sue the association was unnecessary, as appears from the brief concurring opinion by the other members of the court: "We concur in the judgment on the ground that the executors of the deceased Swift cannot sustain the action. Whether or not any other person or persons can do so, it is not necessary, we think, to decide." *Warman Steel Casting Co.* v. *Redondo Beach Chamber of Commerce, supra,* is still less convincing. The objects of the defendant association were "to secure attractions and public entertainments; to foster and encourage commerce; stimulate home trade; secure manufactures; improve and beautify streets and parks; attract tourists; induce immigration and to obtain the organized efforts of our citizens for the better promotion of the best interests of Redondo Beach". Assuming that these purposes can in any way be compared with those of the Exchange, there is presented the same situation as in the Swift case: the power to sue was not an essential issue. The court said (p. 41 of 34 Cal. App.): "The first proposition discussed is determinative of the appeal . . . " *St. Paul Typothetae et al.* v. *St. Paul Bookbinders' Union, supra,* upon which the preceding case leans heavily, is very illuminating, both on its facts and in its discussion. The court said (102 N. W. 726): "The Typothetae is not a business association within the proper meaning of the term . . . Its exclusive occupation, as disclosed by the complaint, is that of promoting and protecting the persons, firms, and corporations composing it in controversies with their employees . . . So far as the complaint discloses, *it has no capital stock and no property.* The union is an association of employees or workmen organized for similar purposes; *it has no capital stock or property* . . . " The court later says, significantly (102 N. W. 728): "The defendant union is wholly unlike the associations involved in *Cornfield* v. *Order Brith Abraham,* 64 Minn. 261 [66 N. W. 970], *Steinert* v. *United Brotherhood of Carpenters & Joiners of America,* 91 Minn. 189 [97 N. W. 668], and *Taylor* v. *Order Railway Conductors,* 89 Minn. 222 [94 N. W. 684]. The associations there before the court were engaged in the *business of insuring their members,* a

distinct and well-established line of business . . . " (Italics ours.)

Neither in these nor in other cases which we have found is there any unequivocal holding, necessary to the decision of the case, to the effect that an association with objects and activities similar to those of the Los Angeles Stock Exchange, cannot be sued in its association name. We are not, however, limited to this negative treatment of the question, for there are several pronouncements which suggest the propriety of such a suit, two of which are by the courts of this state. In *Camm* v. *Justice's Court*, 35 Cal. App. 293 [170 Pac. 409], an action on a book account was brought against Sonoma County Good Roads Club, an unincorporated association, the purpose of which was the promotion of public interest in the improvement and maintenance of the streets, roads and highways of Sonoma County. It is true that the complaint alleged that it was "doing business", and that there was no record before the court containing facts to contradict the allegation; so the discussion by the court is, perhaps, not more necessary to the decision than in the Swift and Warman Steel Casting Co. cases. Nevertheless we find the language persuasive. The court said: " . . . we do not think it was necessary to authorize the maintenance of the action against the members of the club by their common name, to show by the complaint the specific purpose or purposes for which the members of the club had so associated themselves together, nor is it important whether it was a voluntary association and not organized and conducted for pecuniary profit to its projectors or members. (*Armstrong* v. *Superior Court*, 173 Cal. 341, 342 [159 Pac. 1176].) By this we mean to say that section 388 has reference to an association of two or more persons who thus band together for the purpose of transacting as a single body *any kind of business, whether for profit to themselves or for charitable or philanthropic purposes,* and that, where persons so associated, to effectuate the specific objects of their association and for the benefit thereof, create liabilities against themselves as such associates, such persons, as such associate, may be proceeded against by their common name in any action to enforce the liabilities so created." (Italics ours.) The later case of *Herald* v. *Glendale Lodge,* 46 Cal. App. 325 [189 Pac. 329], contains what we believe

to be the most satisfactory discussion of this subject, and reaches a conclusion which appears to us to be eminently sound and reasonable. A member of the defendant lodge brought an action to enjoin it from serving liquor in violation of an ordinance. Although the case might perhaps have been decided on the theory of waiver by general appearance, the court did not place its decision solely on that ground. Mr. Justice Sloane first reviewed the prior conflicting decisions in this state, and then said (p. 330):

"We are inclined to hold with the ruling in *Camm* v. *Justice's Court*, 35 Cal. App. 293 [170 Pac. 409]. We see no sufficient reason for restricting section 388 of the Code of Civil Procedure to associations formed for commercial business. As already pointed out, the term 'business' has a common and general application to all sorts of enterprises which engage people's attention and energies. When a number of persons are associated under a common name in an undertaking in which the associates incur obligations for which they are legally liable, why should they not be sued in the common name which they have adopted, whether it is a money-making concern or otherwise? Indeed, the question of profit is the only distinction that exists between the two classes of associations suggested. If a number of persons were associated together furnishing to their patrons for pay precisely the same accommodations, entertainment and service that the Elks' lodge furnishes its members, there would be no question but that they were engaged in a 'business'. Why should a different rule of liability exist because the associates happen to contract their liabilities in an enterprise in which they are catering to themselves? The word 'business', in its broad sense, embraces everything about which one can be employed; and in its narrower sense it signifies a calling for the purposes of livelihood or profit. (*Easterbrook* v. *Orphan Society*, 85 Conn. 289 [41 L. R. A. (N. S.) 615, 82 Atl. 561].) Where the sense in which the word is used is open to construction, it should be accepted with the meaning most in harmony with the context."

One other decision seems worthy of quotation here. In *Fitzpatrick* v. *International Typographical Union*, 149 Minn. 401 [184 N. W. 17], the defendant union, an unincorporated association, was sued, and service of process was made upon a member thereof. The court considered its earlier holdings

in *St. Paul Typothetae* v. *St. Paul Bookbinders' Union,* *supra,* and *Taylor* v. *Order of Railway Conductors,* 89 Minn. 222 [94 N. W. 684], and decided that the latter case was controlling. In doing so, it reversed the judgment of the trial court, which had made an order vacating the service. The opinion states (184 N. W. 18) : " . . . we find that its activities embrace many having no necessary connection with its activities as a union and quite apart from 'the promotion of the interests and welfare of their members' . ... ' The constitution provides for dues. It provides for a union printers' home. It provides for an old age pension fund. It provides for death benefits . . . The home is in the name of a distinct corporation. The defendant functions not only as a labor union, having the welfare of its members as trade unionists in view, but as an organization which through dues coming from its members gives old age pensions, death benefits, and a home for eligible infirm and invalid members."

The conclusion to which we are led by these authorities is that the Los Angeles Stock Exchange is an association engaged in business within the meaning of section 388 of the Code of Civil Procedure. It is unquestionably engaged in business in the broad sense of the term, and, we believe, in any other reasonable sense of the term as well. It is, of course, true that the main business transacted in its quarters is the business of others, the individual members. We might even concede, perhaps, that the business transacted by the Exchange is incidental to its main purpose, and that its main purpose is not the transaction of business. Such is the contention that petitioner makes. But that these activities are incidental in no way alters the fact that they constitute the doing of business. There is nothing in the statute which requires that the associates be exclusively engaged in business, or in any one business to the exclusion of all others. It is sufficient if they associate together for the purpose of transacting business. Whether they have additional noncommercial purposes is immaterial. This is what we conceive to be the meaning of the statute, and the prevailing view of the authorities.

We have already summarized the purposes and activities of the Exchange. It has sold seats, charged and collected listing fees, acted as escrow-holder, and from the proceeds

of its enterprises is constructing a building to bring in more revenue. Petitioner points out that these profits do not accrue to the members, and that they have no rights in any of the property of the association until dissolution. This statement is undeniably true as far as it goes, although there seems to be no reason why the members, at any time, could not agree to dissolve the association, in which case they would divide these assets. But apart from this possibility, we differ with petitioner as to the conclusion to be drawn from this statement. The question is not whether the members secure for themselves any profits, present or prospective, but whether there is a business. Here we have a business, and one which earns large profits. If they are not the profits of the members individually, they must be the profits of the association itself, and such is, indeed, the fact. No amount of theoretical argument can escape the fact that money is being received for services rendered, and that the money so received and the property purchased with it is held by trustees for the association.

Only by disregarding the normal meaning of its language could we adopt the narrow interpretation of section 388 which petitioner urges. But the history of the statute, already discussed, suggests the opposite interpretation. Since it establishes no substantive liability, and merely provides a convenient method of suit to enforce an existing liability, there is certainly no reason to restrict its application to any one class of associations doing business. It abrogates a rule unsuited to present conditions, and should receive a liberal construction.

We have given due consideration to the argument of petitioner that the use of the words "joint liability" was intended to limit suits brought under the statute to those against associations, the members of which were jointly liable for its obligations; and that such liability only attaches to the members of a "trading association". The case of *McCabe* v. *Goodfellow*, 133 N. Y. 89 [17 L. R. A. 204, 30 N. E. 728], cited to this point, held that the members of a "law and order association" were not liable for certain debts contracted by the president. The case is doubtless correct in its statement of the principles upon which liability might or might not be enforced in the situation before the court, but it does not deal with the question of suit, and

hence can hardly be of assistance in construing our statute. Moreover, we are not sure that we perceive the relevancy of the subtle distinction between a "trading association" and one transacting business, with respect to the problem before us here. We may concede that the statute was enacted so that suits might be brought to enforce an established liability, and that it does not contemplate the bringing of actions where no liability exists. In this it is similar to every other statute which provides a remedy for the enforcement of a right. But that the court should test this procedural statute in each case, by attempting to determine in advance of a trial whether a joint liability actually exists on the facts, was plainly not the legislative intention. It would be highly improper for us to express an opinion as to the liability of the associates under the facts and the law. That is a matter upon which there is neither evidence nor proper pleadings before us. Of course, if the associates engage in business under a common name, they would normally incur joint liabilities in the conduct of that business. But that issue must first be presented to the trial court. In determining the question of jurisdiction, there is no need for us to decide anything except that they are so engaged in business. As one court bluntly remarked: "Whether the plaintiff can get anywhere with his case does not interest us; or whether his judgment, if he gets one, will be of use." (*Fitzpatrick* v. *International Typographical Union, supra;* see, also, *Embree* v. *McLennan,* 18 Wash. 651 [52 Pac. 241].)

The application by petitioner for a writ of prohibition on behalf of Los Angeles Stock Exchange is denied.

Curtis, J., Seawell, J., Preston, J., and Shenk, J., concurred.

Rehearing denied.