[Civ. No. 18244. Fourth Dist., Div. One. Mar. 8, 1979.]

FRANK T. BARR et al., Plaintiffs and Appellants, v.
UNITED METHODIST CHURCH, Defendant and Respondent;
GEORGE HALL et al., Interveners and Respondents.

## COUNSEL

Milberg, Weiss, Bershad & Specthrie, William S. Lerach, Gregg A. Johnson, Frederic J. Milberg, Wied, Granby & Alford, Colin W. Wied and David J. Yardley for Plaintiffs and Appellants.

Sullivan, Jones & Archer, John H. L'Estrange, Jr., Daniel R. Salas, Robert V. Vallandigham, Jr., William F. Fahey, Allan J. Reniche, James O. Sullivan, Witwer, Moran, Burlage & Atkinson, Samuel W. Witwer, Sr., Samuel W. Witwer, Jr., R. Dennis Claessens and Frank J. Casey for Defendant and Respondent.

Breed, Abbott & Morgan, Thomas A. Shaw, Jr., and Robert R. Elliott III as Amici Curiae on behalf of Defendant and Respondent.

O'Melveny & Myers, Bennett W. Priest, Robert J. White and Adina L. Savin for Interveners and Respondents.

## OPINION

**WIENER, J.**—The guarantees of due process of law and religious freedom under the state and federal Constitutions do not prohibit the United Methodist Church, a legal entity under Code of Civil Procedure section 388, subdivision (a), from being sued.[1] We reverse the order of the

---

[1]Code of Civil Procedure section 388, subdivisions (a) and (b), provides as follows:

"(a) Any partnership or other unincorporated association, whether organized for profit or not, may sue and be sued in the name which it has assumed or by which it is known.

"(b) Any member of the partnership or other unincorporated association may be joined as a party in an action against the unincorporated association. If service of process is made on such member as an individual, whether or not he is also served as a person

trial court quashing service of summons on the United Methodist Church.[2]

## The Procedural Background

Plaintiffs commenced their class action on behalf of approximately 1,950 present and former residents of the 14 retirement homes operated in California, Hawaii and Arizona by Pacific Homes Corporation (Pacific Homes) for equitable relief or damages.[3] The complaint alleged each member of the class had entered into a "continuing care agreement" with Pacific Homes;[4] that on or about February 18, 1977, Pacific Homes petitioned for relief under chapter 11 of the Bankruptcy Act in the United States District Court for the Central District of California, and that the defendants Pacific and Southwest Annual Conference of the United Methodist Church (PSWAC), a California corporation, the General

---

upon whom service is made on behalf of the unincorporated association, a judgment against him based on his personal liability may be obtained in the action, whether such liability be joint, joint and several, or several."

[2]The entire text of the minute order is as follows:

"The 'United Methodist Church' is an international religious denomination consisting of over 10,000,000 persons who worship in some 43,000 churches and missions throughout the world. The 'United Methodist Church' is a 'connectional' structure maintained through a chain and series of periodic conferences. It has never been incorporated.

"A respected unbiased source, 'The Encyclopedia Britannica,' 1959 Ed., Vol. 15, p. 358, states: 'Methodism has continued for more than two centuries to proclaim a freedom of spirit as opposed to the bondage of an organization, and its appeal has been based on the reality of a personal experience of spiritual emancipation through faith in Christ.'

"The Court rules that: 'The United Methodist Church' is no more than a 'spiritual confederation' and is not a jural entity or unincorporated association subject to suit under Code of Civil Procedure 388. A contrary ruling would effectively destroy Methodism in this country, and would have a chilling effect on all churches and religious movements by inhibiting the free association of persons of similar religious beliefs. If all members of a particular faith were to be held personally liable for the transgressions of their fellow churchmen, church pews would soon be empty and the pulpits of America silent.

"Accordingly, the motion to quash service of process on 'The United Methodist Church' is granted."

[3]The original complaint, filed September 21, 1977, contained six causes of action. The first amended complaint, filed December 2, 1977, with seven causes of action, sought the same relief as the original complaint, but added as defendants the accounting firm of Coopers and Lybrand, and the General Council on Finance and Administration of the United Methodist Church (GCFA), a corporation. Reference to the complaint includes reference to the first amended complaint.

[4]The continuing care agreement provided that Pacific Homes would furnish lifetime care, including medical, nursing and convalescent care, accommodations and in most instances, food service. Many of the plaintiffs had prepaid their contracts and were entitled to lifetime care at no additional cost; agreements involving the remaining plaintiffs required fixed monthly payments for life, guaranteed never to increase or limited to deferred increases based upon inflation.

Council on Finance and Administration of the United Methodist Church (GCFA), and the United Methodist Church (UMC), were each financially responsible for the operations of Pacific Homes. Plaintiffs sought a declaration requiring each of the defendants to specifically perform the continuing care agreements between each plaintiff and Pacific Homes or for damages.

Plaintiffs' bases for jurisdiction over UMC in each cause of action are the allegations which state UMC was an unincorporated association, Pacific Homes was the agent of the defendants PSWAC, GCFA and UMC and in doing the acts alleged was acting within the scope of its authority as agent and with the permission, knowledge and consent of PSWAC, UMC and GCFA; each defendant or predecessor in interest was the agent of each other defendant and in doing the acts alleged, each was acting within the scope of his authority with the permission, knowledge and consent of each other defendant; and Pacific Homes was the alter ego of each defendant.

Persons upon whom service of process was attempted on behalf of UMC moved to quash the service under Code of Civil Procedure section 418.10 on the grounds that (1) UMC was merely a loose connectional system and not a jural entity capable of being sued under Code of Civil Procedure section 388, subdivision (a); and (2) to permit suit against UMC was unconstitutional as a violation of the due process, free exercise and establishment of religion provisions of the United States and California Constitutions. Plaintiffs appeal from the order granting the motion to quash service of summons (Code Civ. Proc., § 904.1, subd. (c)).

*The United Methodist Church Is a Jural Entity Under Code of Civil Procedure Section 388, Subdivision (a)*

*The Status of UMC in the Litigation Is a Question of Law and Not of Fact*

■ The initial argument made by UMC is that as an elementary principle of appellate procedure, we must uphold the trial court order if it is supported by any substantial evidence. (See gen. *Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, p. 4237.) The first difficulty we encounter with this proposition is it assumes the trial judge made a factual determination. Although there was a plethora of evidence on the issue of whether UMC was an unincorporated association, the trial court explained its holding by reference to two sets of considerations. One was

peculiar to Methodism with apparent reliance on the Encyclopedia Britannica as an unbiased source; the other was of general applicability to "all churches and religious movements" with the apparent assumption that the suit against UMC involved the unconstitutional interference with the free exercise of religion. Nothing is contained in the trial court order which suggests a factual determination was made which involved the process of weighing the evidence which was presented. Secondly, the analysis of whether UMC is a jural entity involves a review of data relating to the creation, existence and operation of UMC. The facts contained in the affidavits and declarations submitted, including the information in The Book of Discipline of the United Methodist Church (1976), are not in dispute. The only ostensible factual conflict which arises is related to the ultimate issue expressed in opinions of witnesses on behalf of UMC to the effect that UMC cannot be sued. "In short, this is not a true case of conflicting evidence in which a reviewing court will refuse to disturb findings based thereon." (*Cosper* v. *Smith & Wesson Arms Co.* (1959) 53 Cal.2d 77, 81 [346 P.2d 409]; see also *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866, fn. 2 [44 Cal.Rptr. 767, 402 P.2d 839].) The result which must be reached in this case does not rest on ecclesiastical expertise, but rather on principles of law. The question as to the jural status of UMC is one of law and not of fact. (*Ibid.*; cf. *Brandeburg* v. *New York Tel. & Tel. Co.* (1975) 49 Cal.App.3d 893, 896 [123 Cal.Rptr. 255]; *Agalite-Bronson Co.* v. *K. G. Limited* (1969) 270 Cal.App.2d 308, 310 [75 Cal.Rptr. 527].)

### *The Criteria to Be Applied to Determine Whether an Entity Is Capable of Being Sued as an Unincorporated Association*

"For a long time the established rule was that in the absence of statute, an unincorporated association could not sue or be sued in its common name; all the members thereof had to appear in their own names as parties plaintiff or defendant. The basic reason was that the association was not, in the eyes of the law, a legal unit or entity, and had no legal capacity to become a party to an action. [Citations.] The difficulty was only one of procedure, and the objection was purely technical. The liabilities or rights of the members were in no way involved, and were not, in theory, impaired by the operation of the rule. They might have brought actions if they all joined as plaintiffs, and they might have been held to any liability imposed upon them by law, if sued and served individually. But where associations with large membership were involved, the operation of the rule frequently had inconvenient and unjust consequences, and various exceptions came to be recognized." (*Jardine* v.

*Superior Court* (1931) 213 Cal. 301, 307-308 [2 P.2d 756, 79 A.L.R. 291].) Code of Civil Procedure section 388, enacted to eliminate procedural problems in actions against an unincorporated association, was held constitutional in *Jardine* v. *Superior Court, supra.*

In its original form, only persons transacting business under a common name could be sued in that name, but "business" was ultimately construed so broadly it constituted a slight limitation on the right to sue an unincorporated association. (See Law Revision Com. com. (1967 amend.); *Herald* v. *Glendale Lodge No. 1289* (1920) 46 Cal.App. 325, 330 [189 P. 329].) ■ The 1967 amendment to Code of Civil Procedure section 388 made clear an unincorporated association, whether organized for profit or not, could either sue or be sued in the name which it had assumed or by which it was known. The trend of case law has been the rejection of legal niceties to assure full recognition of the unincorporated association as a separate legal entity. The basis for this rejection of procedural rigidity has been specifically articulated in labor law disputes.

"The social and economic realities of the present-day organization of society has thus led this court and others to recognize the suability of unions. [Fn. omitted.] . . . We must recognize that the society of today rests upon the foundation of group structures of all types, such as the corporation, the cooperative society, the public utility. Such groups must, of course, operate successfully within the society; one of the prerequisites to that functioning is, generally, liability to suit and opportunity for suit. To frustrate that viability by the imposition of outmoded concepts would be to impair the institutions as well as to impede the judicial process." (*Daniels* v. *Sanitarium Assn., Inc.* (1963) 59 Cal.2d 602, 607-608 [30 Cal.Rptr. 828, 381 P.2d 652]; see also *Marshall* v. *International Longshoremen's & Warehousemen's Union* (1962) 57 Cal.2d 781 [22 Cal.Rptr. 211, 371 P.2d 987].)

Statutory enactments in California involving the unincorporated association have been consistent with case law development. In 1967 the Corporations Code was amended to include the definition of unincorporated association as "any partnership or other unincorporated organization of two or more persons, whether organized for profit or not . . . ." (Corp. Code, § 24000, subd. (a).) It has been made liable to third persons to the same extent as if the association were a natural person (Corp. Code, § 24001); and may protect its name and insignia (Corp. Code, §§ 21300-21310).

On a national basis, the trend continues to assure legal status to organizations where in fairness it is appropriate. For example, in *State of Georgia* v. *National Democratic Party* (D.C.Cir. 1971) 447 F.2d 1271, cert. den. (1971) 404 U.S. 858 [30 L.Ed.2d 101, 92 S.Ct. 109], the National Republican Party, one of the named defendants, was found to be an unincorporated association contrary to its argument that it was composed only of state republican parties which acted in concert to conduct national party business and that between the quadrennial conventions, the Republican National Committee handled the national affairs of the Republican National Convention. In *Ripon Society* v. *National Republican Party* (D.C.Cir. 1975) 525 F.2d 567, responding to the assertion that "no such national [Republican] party is formally constituted under any state or federal law, and that the term is merely a collective description of the individual state and territorial Republican Parties," the court said: "We know, either from the record or through judicial notice, that there is commonly understood to be a National Republican Party, that it is commonly referred to, and contributed to, as such, that it meets quadrennially in a national convention, and that at the last such convention it formally declared itself 'a nationwide Party,' whose 'general management' it entrusted to the Republican National Committee 'subject to direction from time to time of the National Convention.' " (*Id.*, at pp. 571-572, fn. 5.)

Groups which have been included as unincorporated associations in addition to labor unions (*United Mine Workers of America* v. *Coronado Coal Co.* (1922) 259 U.S. 344 [66 L.Ed. 975, 42 S.Ct. 570, 27 A.L.R. 762]; *Juneau Spruce Corp.* v. *I. L. & W. Union* (1953) 119 Cal.App.2d 144 [259 P.2d 23]) and political parties are social clubs, religious organizations, environmental societies, athletic organizations, condominium owners, lodges, stock exchanges and veterans.[5] The criteria applied to determine whether an entity is an unincorporated association are no more complicated than (1) a group whose members share a common purpose, and (2) who function under a common name under circumstances where fairness requires the group be recognized as a legal entity. Fairness includes those

[5]See, for example, *Moose Lodge No. 107* v. *Irvis* (1972) 407 U.S. 163 [32 L.Ed.2d 627, 92 S.Ct. 1965] (social club); *Presbyterian Church* v. *Hull Church* (1969) 393 U.S. 440 [21 L.Ed.2d 658, 89 S.Ct. 601] (church); *Alyeska Pipeline Service Co.* v. *Wilderness Society* (1975) 421 U.S. 240 [44 L.Ed.2d 141, 95 S.Ct. 1612]; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049] (environmental societies); *California State University, Hayward* v. *National Collegiate Athletic Assn.* (1975) 47 Cal.App.3d 533 [121 Cal.Rptr. 85] (athletic organization); *White* v. *Cox* (1971) 17 Cal.App.3d 824 [95 Cal.Rptr. 259, 45 A.L.R.3d 1161] (condominium owners); *Herald* v. *Glendale Lodge, supra*, 46 Cal.App. 325 (lodge); *Jardine* v. *Superior Court, supra*, 213 Cal. 301 (stock exchange); and *Schlesinger* v. *Reservists To Stop The War* (1974) 418 U.S. 208 [41 L.Ed.2d 706, 94 S.Ct. 2925] (veterans).

situations where persons dealing with the association contend their legal rights have been violated. (See *Operative Plasterers', etc., Assn.* v. *Case* (D.C.Cir. 1937) 93 F.2d 56, 65.) Formalities of quasi-corporate organization are not required. (*Law* v. *Crist* (1940) 41 Cal.App.2d 862, 865 [107 P.2d 953]; *Estate of Irwin* (1925) 196 Cal. 366, 372 [237 P. 1074].) Courts have even assessed liability against a church association with no officers where there were only nine persons whose sole business transaction (aside from small purchases of printed religious material) was the purchase, by down payment, of a station wagon. (*Steuer* v. *Phelps* (1974) 41 Cal.App.3d 468 [116 Cal.Rptr. 61].)

UMC contends an essential element for legal status, the creation of associate liability in furtherance of the common purpose (*Jardine* v. *Superior Court, supra,* 213 Cal. 301, 317) is absent in the instant case because *all* members and connected bodies of the denomination have not delegated agency authority to Pacific Homes to act on behalf of UMC. This circuitous argument, however, assumes actual agency must be conferred on Pacific Homes before any defendant can be liable. Whether Pacific Homes had actual authority to act on behalf of UMC is unnecessary for the application of doctrines relating to either alter ego or agency. To hold otherwise would permit an unincorporated association to escape liability by the simple technique of requiring express consent from all units of the association.

### The Organization of UMC

■ In resolving intra-church schisms or property disputes, courts have identified at least two categories of church polities;[6] congregational and hierarchal. (See gen., *Watson* v. *Jones* (1872) 80 U.S. (13 Wall.) 679, 722 [20 L.Ed. 666, 673]; *Kedroff* v. *St. Nicholas Cathedral* (1952) 344 U.S. 94 [97 L.Ed. 120, 73 S.Ct. 143].) UMC is not congregational, i.e., the local church is not the highest authority in all matters of doctrine and usage. It is hierarchal; the 43,000 local churches and 114 annual conferences are governed through the structure described by The Book of Discipline of the United Methodist Church (Discipline).[7] In United Methodism, "the local

[6]"Polity refers to the general governmental structure of a church, the organs of authority and the allocation and locus of its judicatory powers as defined by its own organic law." (*Brady* v. *Reiner* (W.Va. 1973) 198 S.E.2d 812, 827; see also Note, *Judicial Intervention in Disputes Over the Use of Church Property* (1962) 75 Harv.L.Rev. 1142, 1143-1144.)

[7]"The content of the Discipline changes quadrennially. The concept of the Discipline as setting forth the plan, polity and process by which United Methodists govern themselves remains constant . . . ." (Discipline (1976) Episcopal Greetings, p. v.)

church is a part of the whole body of the general church and is subject to the higher authority of the organization and its laws and regulations." (*Carnes* v. *Smith* (1976) 236 Ga. 30 [222 S.E.2d 322, 325], cert. den. 429 U.S. 868 [50 L.Ed.2d 148, 97 S.Ct. 180].) "The Methodist Church . . . is a connectional church, governed by representative bodies, with an episcopacy whose powers and duties are constitutionally defined. It has an itinerant ministry in that its ministers are assigned by officials of The Methodist Church and are not called by local societies or subject to the control or discipline of local societies. The basic representative body of The Methodist Church is the Annual Conference made up of ministerial and lay delegates from local societies in each area embraced within an Annual Conference. An Annual Conference is divided for purposes of administration into Districts. The administration of a District is entrusted to a District Superintendent. The General Conference of The Methodist Church, made up of delegates from each Annual Conference of the Church, is the highest legislative body of the Church, determining the ecclesiastical and temporal policies of the Church. The Judicial Council is the highest judicatory body of the Church, deciding appeals taken on legal issues raised within the Church. The Discipline of The Methodist Church is the book of law of the Church containing the Articles of Religion, the Constitution, the rules of the church concerning the moral conduct of its members, and the legislation of the various General Conferences defining the form of government, the duties, powers and privileges of the members, ministers and various bodies of the Church, including the law of the Church with reference to the acquisition, conveyancing and alienation of real estate." (*Goodson* v. *Northside Bible Church* (S.D.Ala. 1966) 261 F.Supp. 99, 101.)

UMC may be unique in that it has no single chief operating officer, but the clearly defined operating and conceptual levels of responsibility starting with the general conference, "[t]he legislative body for the entire Church" (Discipline, Glossary, p. 598), the annual conference, the district conference, the charge conference, the local church conference and the local church cannot be ignored. Moreover, a persuasive argument can be made that the Council of Bishops is equivalent to the board of directors of UMC. According to Discipline, the "Council of Bishops is thus the corporate expression of episcopal leadership in the Church" which is required "to meet at stated intervals" in order to oversee "the spiritual and temporal affairs of the whole church." (Discipline, par. 525.)

Control over the local church ranging from the restrictions on purchase or sale of real estate which requires authorization from the charge conference and the written consent of the pastor and district superintendent (Discipline, par. 2429, 2431, 2433, pp. 547-549) to the selection of local church pastors is more reflective of a single entity than completely autonomous and independent units.

The day to day operation of UMC is in keeping with the reality of its organization. The GCFA, characterized by UMC in this appeal as merely a nondiscretionary conduit rendering nondiscretionary auditing and financial service to some of the general level agencies with United Methodism, has in fact held itself out somewhat differently. In applying for a group exemption under section 501(c) of the Internal Revenue Code of 1954, GCFA described itself as "the central treasury and fiscal agent of the United Methodist Church. The Council has been established by the General Conference to act as its finance committee and accordingly its duties are legislated in Paragraphs 837-865 of the Book of Discipline." In that application, the GCFA made reference to paragraph 843.3 of Discipline which authorizes GCFA "to take all necessary legal steps to safeguard and protect the interest and rights of the United Methodist Church." A reasonable legal inference which can be drawn from this grant and description of authority to an agent is the existence of UMC as principal. This is particularly true where that agent, in addition to being accountable for "all matters relating to the receiving, disbursing, and reporting of general church funds"[8] (Discipline, par. 906, p. 333); is required "[t]o take all necessary legal steps to safeguard and protect the interests and rights of The United Methodist Church; to maintain a file of legal briefs related to cases involving The United Methodist Church, and to make provisions for legal counsel where necessary in order to protect the interests of the Church at the request of a general agency or a bishop, as the Council deems advisable." (Discipline, par. 907, subpar. 4, pp. 338-339.) In addition to the cases cited previously (*Carnes* v. *Smith, supra,* 222 S.E.2d 322; *Brady* v. *Reiner, supra,* 198 S.E.2d 812; *Goodson* v. *Northside Bible Church, supra,* 261 F.Supp. 99, affd. 387 F.2d 534 (5th Cir. 1967)), UMC has appeared as principal in other litigation. (See *United Meth. Ch.* v. *St. Louis Crossing Ind. Meth. Ch.* (1972) 150 Ind.App. 574 [276 N.E.2d 916, 52 A.L.R.3d 311; the United Methodist Church, Dr.

---

[8]Approximately 5½ percent of total member contributions are given annually to GCFA. In What Happens To All That Money? (1977 ed.) United Methodist Communications, Dr. Ewing T. Wayland, described as the treasurer of UMC, said: "In 1975, United Methodists giving to the support of the general church totaled $58,155,600—5.38 percent of the total amount paid by local churches for all purposes." (At p. 5.)

McCoy Johnson, in his representative capacity as the District Superintendent of the American District of the South Georgia Annual Conference, etc. v. J. W. Sparrow, civil action No. 6881 (Superior Court of Dooly Co., Georgia, 1976).)[9] Other cases in which an agency of the UMC has been involved reiterate the hierarchal and organizational structure of UMC. (See, e.g., *Hoffman v. Tieton View Community M. E. Church* (1949) 34 Wn.2d 83 [207 P.2d 699, 705-706]; *Trustees of Peninsula Annual Conference v. Spencer* (1962) 40 Del. Ch. 418 [183 A.2d 588, 589]; *Turbeville v. Morris* (1943) 203 S.C. 287 [26 S.E.2d 821, 825].)

The possibility of UMC's liability has not gone unnoticed by those responsible for insurance coverage. UMC is a named insured on a high limit contract of insurance commencing June 1, 1976, to June 1, 1979, with a broad range of fidelity, casualty, property, fire, theft, medical malpractice and comprehensive general liability coverage. The policy as issued describes UMC as a corporation engaged in business as a religious organization.

In summary, UMC is a highly organized religious body working through specific agencies to accomplish laudable goals.

### The Relationship Between Pacific Homes and UMC Requires UMC Be Recognized as a Legal Entity

Before we examine the circumstances surrounding the activities of Pacific Homes and the alleged involvement of UMC, we wish to stress that our decision in the pleading phase of this litigation does not imply any lack of compassion by UMC or infer liability on its part. Our holding based upon neutral principles of law simply determines UMC is suable. What the outcome of that suit will be or should be is not before us.

Pacific Homes, a nonprofit organization, was formed in 1929 by the Southern California annual conference (the predecessor of the PSWAC) of the Methodist Episcopal Church. Amended articles of incorporation signed in January 1929 expressly provided that the powers of the corporation subject to California law shall be "subject to the uses and Discipline of The Methodist Church as from time to time authorized and declared by the General Conference of said Church and by the Annual

---

[9]We are aware that counsel for UMC in the Georgia case filed his affidavit indicating the decision to include UMC as plaintiff was his alone. Whether actually authorized or not, the belief by UMC's own lawyer as to the jural status of UMC is certainly relevant to our inquiry.

Conference within whose bounds the said corporation is located." The articles also provided that before either voluntary or involuntary dissolution, the corporate assets shall be subject to the annual conference of the Methodist Church or its successors; bylaws adopted or amended shall not be inconsistent with the Book of Discipline; and membership in the corporation was restricted to the Southern California-Arizona annual conference of the Methodist Church.

The relationship between Pacific Homes and UMC has continued since 1929 in a similar fashion. Through the years, the Board of Directors of Pacific Homes has been either appointed by the Methodist Church's annual conference in Southern California or composed of Methodist ministers and lay persons of the annual conference.

In the first list of hospitals and homes of the Methodist Church published in 1967 by the Methodist Health and Welfare Certification Council of the Board of Hospitals and Homes of the Methodist Church, Pacific Homes was given affiliate status, the highest level attainable for that year. In addition to its relationship with UMC, certification established the quality of services rendered by Pacific Homes met the minimum basic standards for professional health and welfare services recognized by the General Board of Hospitals and Homes of the Methodist Church. Until financial difficulties started, the successful performance by Pacific Homes was pointed to with pride over a number of years in many public statements by the president of UMC's Council of Bishops.

The literature prepared by Pacific Homes distributed to persons interested in either a convalescent hospital or a retirement residence expressly stated that Pacific Homes was an agency of the United Methodist Church Southern California-Arizona conference. In describing the cost, Pacific Homes referred to itself as being sponsored by the Southern California-Arizona conference of the United Methodist Church and offered a special program of assistance to help a limited number of United Methodists.

Plaintiffs' complaint mirrors the literature of Pacific Homes alleging agency, sponsorship and control over Pacific Homes.

The events referred to in the pleadings and described in the documents presented to the trial court refer to activities which not only involve spiritual concerns relating to the health and welfare of either the elderly

or infirm, but which are commercial activities. The costs for lodging and the type of accommodations are primarily business decisions. UMC, in fulfilling its commitment to society, has elected to involve itself in worldly activities by participating in many socially valuable projects. It has enjoyed the benefits, both economic and spiritual, of those projects. It has even on occasion filed suit for the protection of its interests. It must now, as part of its involvement in society, be amenable to suit.

### Due Process of Law Does Not Preclude UMC From Being Sued

UMC argues the due process implications of this case are inescapable. If suit against UMC is permitted, the assets of the scores of thousands of United Methodist institutions throughout the world having no contacts with either California or Pacific Homes will be subject to levy—a constitutionally impermissible result because distant Methodist units would have been unable to defend themselves on the merits of the controversy.

The complexities, both legal and factual, in the present litigation are immense. To add a constitutional requirement, however, that before UMC can be recognized as an entity, plaintiffs must also identify each asset that may be reached to assure the absence of any third party claim in that asset, is to create an issue where one does not exist. We recognize the inextricable relationship between obtaining a judgment and having it satisfied; nevertheless, to adjudicate questions on ownership of property before judgment is essentially a reversal in the process of litigation.

The due process issue described by UMC is reflected in Code of Civil Procedure section 388, subdivision (b), which provides: "Any member of the partnership or other unincorporated association may be joined as a party in an action against the unincorporated association. If service of process is made on such member as an individual, whether or not he is also served as a person upon whom service is made on behalf of the unincorporated association, a judgment against him based on his personal liability may be obtained in the action, whether such liability may be joint, joint and several, or several."

Before any liability can be assessed against any person, service of process on the individual in his individual capacity must be made. Plaintiffs concede that no individual has been sued by virtue of membership in the UMC. California Corporations Code section 24002 provides: "Only the property of an unincorporated association may be

levied upon under a writ of execution issued to enforce a judgment against the association." Corporations Code section 21102 provides further that: "No presumption or inference existed prior to September 15, 1945, or exists after that date, that a member of a nonprofit association has consented or agreed to the incurring of any obligation by the association, from the fact of joining or being a member of the association, or signing its by-laws."

■ An action against an association sued in its common name is an action against a single defendant. (*Potts* v. *Whitson* (1942) 52 Cal.App.2d 199, 205 [125 P.2d 947].) California statutes provide due process safeguards in those situations unlike the case at bench where liability is sought to be imposed against individual units of the UMC neither named as a party nor served.

### *The Action Against UMC Does Not Violate the Free Exercise and Establishment of Religion Provisions of the United States and California Constitutions*

We have previously stated that UMC's status in the context of this appeal is a question of law, thus rejecting the ecclesiastical expertise furnished by persons knowledgeable in the history, development and faith of United Methodism. Whether we may do so is challenged by UMC under both the federal and state Constitutions.[10] UMC contends the First and Fourteenth Amendments prevent a civil court from independently examining its polity to conclude it is suable contrary to church doctrine.

■ There are situations specifically in internal church disputes where civil courts are required to accept the decision of the highest body of the church. "[T]he First and Fourteenth Amendments permit hierarchal religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government

---

[10]Amendment I of the U.S. Constitution provides in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."

Article I, section 4 of the California Constitution provides in pertinent part: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion."

and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." (*Serbian Orthodox Diocese* v. *Milivojevich* (1976) 426 U.S. 696, 724-725 [49 L.Ed.2d 151, 171, 96 S.Ct. 2372].) This rule, however, has not been extended into secular disputes. Clearly the present case is secular. To defer absolutely to authoritative church experts would be to grant immunity to religious organizations in cases which might arise far afield from religious activities with the resultant effect that civil courts would then be subordinate to organizations which might attempt to classify themselves as religious to obtain the benefits of the shield of First Amendment protection.

California cases addressing this issue outside the realm of intra-church disputes have held that civil courts are not bound by a church's constitution or its ecclesiastical doctrine. (*Queen of Angels Hospital* v. *Younger* (1977) 66 Cal.App.3d 359, 372 [136 Cal.Rptr. 36]; *In re Metropolitan Baptist Church of Richmond, Inc.* (1975) 48 Cal.App.3d 850, 859 [121 Cal.Rptr. 899].)

To hold UMC suable is not equivalent to a review of its polity thus interfering with its internal affairs in violation of the free exercise clause of the First Amendment. There is no evidence to show that rendering UMC amenable to suit would affect the distribution of power or property within the denomination, would modify or interfere with the modes of worship affected by Methodists or would have any effect other than to oblige UMC to defend itself when sued upon civil obligations it is alleged to have incurred. The cases involving UMC entities previously cited eliminates any idea there may be religious prohibitions to participation in civil litigation.

We are keenly aware of the church-state separation articulated both in our state Constitution (see *Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 799-806 [150 Cal.Rptr. 867, 587 P.2d 663], conc. opn. of Bird, C. J.) and federal Constitution. We have kept firmly in mind the clauses pertaining to religious freedom are aimed at preserving government neutrality in matters pertaining to religion while securing religious goals free of government restraints. We have considered each clause forbids two quite different kinds of governmental encroachment upon religious freedom (see *Engle* v. *Vitale* (1962) 370 U.S. 421, 430 [8 L.Ed.2d 601, 607, 82 S.Ct. 1261, 86 A.L.R.2d 1285]; see also *Abington School District* v.

*Schempp* (1963) 374 U.S. 203, 221 [10 L.Ed.2d 844, 857, 83 S.Ct. 1560]) nevertheless, nothing either our state or federal Supreme Court has said has even remotely implied that "under the cloak of religion, persons may, with impunity, commit frauds upon the public." (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 306 [84 L.Ed. 1213, 1219, 60 S.Ct. 900, 128 A.L.R. 1352].) ■ The free exercise clause of the First Amendment which assumes the absolute freedom to believe does not grant absolute freedom to act. Conduct remains subject to regulation for the protection of society. (*Cantwell, supra,* at pp. 303-304 [84 L.Ed. at pp. 1217-1218].) Conduct, albeit based upon religious motivation, may be restricted by neutral legislation. (*Braunfeld* v. *Brown* (1961) 366 U.S. 599, 603 [6 L.Ed.2d 563, 566, 81 S.Ct. 1144]; *Reynolds* v. *United States* (1879) 98 U.S. 145 [25 L.Ed. 244].) To permit unbridled behavior "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect, to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." (*Id.,* at pp. 166-167 [25 L.Ed. at p. 250].) To apply a different standard to determine the jural status of religious organizations as opposed to nonreligious organizations in purely secular suits might very well constitute a preference for religion in violation of the establishment clause. (*Abington School District* v. *Schempp, supra,* 374 U.S. 203.)

The trial court order reflected the concern that if individual members of a church were to be liable there would be a chilling effect on church membership. This concern, legitimate as it may be, is properly placed with the religious body to consider before becoming involved in commercial affairs and is not a consideration which may be considered in our resolution of the issue before us. A religious organization should not be relieved of its lawful obligations arising out of secular activities because the satisfaction of those obligations may, in some tangential fashion, discourage religious activities. (See *Gospel Army* v. *City of Los Angeles* (1945) 27 Cal.2d 232, 242-247 [163 P.2d 704].)

The statutory enactments involved in this action are for the purpose of providing substantive rights to citizens and to assure access to the courts, including the right to sue organizations functioning as unincorporated associations. The internal ecclesiastical judicial system of UMC does not provide any method of redress for plaintiffs. The use of the courts as a method of dispute resolution cannot be foreclosed to this class of plaintiffs who have alleged fraud, breach of contract and statutory

violations because one of the named defendants is a religious body. Neither the state nor federal Constitution may be interpreted in a manner which would deny plaintiffs the right to sue UMC.

Judgment reversed.

Staniforth, Acting P. J., and Ehrenfreund, J.,* concurred.

The petition of the defendant and respondent for a hearing by the Supreme Court was denied May 17, 1979. Richardson, J., did not participate therein.

*Assigned by the Chairperson of the Judicial Council.