James P. JOHNSON, as Equity
Receiver for the Chilcott
Futures Fund, Plaintiff,

v.

Thomas D. CHILCOTT, Boettcher & Company, Shearson/American Express, Inc., Donald Cunningham, Sid Anders, Ross Bagully, and One or More John and/or Jane Does, and/or Doe Entities, Defendants.

Civ. A. No. 82–C–889.

United States District Court,
D. Colorado.

Dec. 7, 1984.

Arthur E. March, Jr., March, March, Myatt, Korb & Carroll, Fort Collins, Colo., Kenneth C. Groves, Denver, Colo., Rodney Patula, Elaine Menter, Frederick Haines, Pryor, Carney & Johnson, Englewood, Colo., for plaintiff.

Gary J. Malone, Anthony F. Phillips, James L. Condren, Willkie, Farr & Gallagher, New York City, David Ebel, Elizabeth Montgomery, Davis, Graham & Stubbs, David G. Palmer, Holland & Hart, Stephen Waters, Richard P. Slivka, Bosworth & Slivka, Denver, Colo., for defendants.

## ORDER

CARRIGAN, District Judge.

### I. *General Background.*

Thomas D. Chilcott was the president of Chilcott Portfolio Management, Inc. (CPMI), a Colorado corporation located in Ft. Collins, Colorado. From the mid-1970's through June 15, 1981, Chilcott obtained tens of millions of dollars from hundreds of investors by representing to them that their money would be pooled in a highly profitable investment fund. Plaintiff asserts that this fund or pool was first known, informally, as Chilcott Portfolio, and later was known as the Chilcott Futures Fund (CFF).

A Commodities Futures Trading Commission (CFTC) investigation revealed that Chilcott had lied brazenly about the pool's performance and profitability. Actually he had been operating a classic Ponzi scheme. He induced a constant stream of new investments by misrepresenting the alleged pool's performance and profitability and used some of the incoming new funds to pay investors who desired to "cash-out" their investments, often paying them substantial "profits." Ultimately the scheme lost momentum, and in its crash most of the investors' money was lost.

In *CFTC v. Chilcott Commodities Corp., et al.* (Civil Action No. 81–F–999), Chief Judge Finesilver appointed the plaintiff as equity receiver to collect and administer Chilcott's assets. The receiver instituted the present action and sues on behalf of the CFF for dissipation of its assets. The CFF's capacity, standing and very existence as an entity cognizable in law are

challenged by the defendants' instant motions.

The receiver, in his original complaint, alleged that Chilcott directly violated, and that the remaining defendants aided and abetted him in violating, federal antifraud provisions of the Commodity Exchange Act and the Securities Exchange Act of 1934. On July 10, 1984, I granted the defendants' motions to dismiss these federal antifraud claims. 590 F.Supp. 204.

The remaining claims, all state law claims, are for common law fraud, conversion, negligence, negligent supervision, and breaches of fiduciary duties. For reasons of judicial economy, convenience of parties and witnesses, and fundamental fairness, I retained jurisdiction over these state law claims at least until the issues of the plaintiff's capacity and standing to sue have been resolved.

Defendants Shearson and Boettcher are brokerage firms through which Chilcott traded commodities during his fraudulent activity. Defendants Ross Bagully, Donald Cunningham and Sid Anders at various times were employed by either Shearson or Boettcher as brokers handling the ill-fated investments. The sixth defendant is Thomas D. Chilcott. He is presently incarcerated.

## II. *The Pending Motions to Dismiss.*

Defendants Boettcher & Company (Boettcher), Shearson Lehman/American Express, Inc. (Shearson), Ross Bagully, and Donald Cunningham have filed motions to dismiss asserting that this court lacks jurisdiction over the subject matter. Fed.R. Civ.P. 12(b)(1). Specifically, the defendants contend that the plaintiff lacks the standing, capacity to sue and real party in interest status required by Fed.R.Civ.P. 17(a) & (b). The issues have been exhaustively briefed. An evidentiary hearing and oral arguments were held July 16–20, 1984.

■ For purposes of these motions to dismiss, all material facts alleged in the complaint must be assumed to be true and the complaint must be construed liberally, giving the plaintiff the benefit of the doubt. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 109 n. 22, 99 S.Ct. 1601, 1612, 13 n. 22, 60 L.Ed.2d 66 (1979); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In ruling on these motions, I express no opinion on the merits of the plaintiff's claims.

## III. *Capacity to Sue.*

The CFF's capacity to commence this action is governed by Fed.R.Civ.P. 17(b). That rule provides that capacity to sue is determined by the law of the state in which the district court is located. In Colorado, a "partnership or other unincorporated association" has the capacity to sue or be sued in its own name and right. Colo.Rev.Stat. § 13–50–105 (1973). Plaintiff contends that the CFF is or at the material times was, a "partnership or other unincorporated association" under Colorado law. Thus the threshold inquiry is whether the plaintiff has met his burden of establishing that status for the collective interests he purports to represent.

### A. *Partnership.*

■ First to be considered is whether there was a partnership under Colorado law. A partnership is created by persons agreeing orally or in writing to "place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business and to divide the profit and bear the loss in certain proportions." *Roberts v. Roberts*, 113 Colo. 128, 155 P.2d 155 (1945). The Uniform Partnership Act, Colo.Rev.Stat. § 7–60–106 (1973) defines a partnership as "an association of two or more persons to carry on, as co-owners, a business for profit."

■ As co-owners, all partners must intend to share losses of the partnership as well as profits. Colo.Rev.Stat. § 7–60–107 (1973); *Quier v. Rickly*, 116 Colo. 5, 177 P.2d 549 (1947). General partners are jointly liable for any claims against the partnership and any wrongful acts of any partner acting in the ordinary course of partnership business. Colo.Rev.Stat. § 7–60–113 (1973). It is not required, however, that every partner participate in the day-to-

day management of the partnership business. Management and control of the business may be delegated by agreement, express or implied.

■ If the parties have placed themselves in a relation which constitutes a partnership, it is not determinative that they call, or do not call, themselves a partnership, or that they expressly deny that a partnership exists. *Richardson v. Keely*, 58 Colo. 47, 142 P. 167 (1914); *Cf. Heinhold Hog Market, Inc. v. McCoy*, 700 F.2d 611, 615 (10th Cir.1983).

Moreover, where a partnership exists, each partner at all times has the right of access to partnership books and records. Colo.Rev.Stat. § 7-60-119 (1973). Finally, it is characteristic of partnerships that a new partner cannot join the partnership without the consent of all who already are partners. Colo.Rev.Stat. § 7-60-118(g) (1973).

To determine whether the CFF was a partnership these elements must be considered in relation to the instant facts. Here, there was an agreement between Chilcott and the investors to combine the investors' money with Chilcott's investment skill and services in a business where profits and losses would be proportionately shared. Further, the CFF is an association of two or more persons to carry on a business for profit. It is doubtful, however, whether the investors and Chilcott are, or were, "co-owners" of the CFF in the sense of partnership co-ownership.

Certainly the investors intended to share profits and losses from the CFF's collective investments. The investors appear to have had no intention, however, of forming an organization which could expose them to liability for claims against the CFF or Chilcott. That limitation on their role in the CFF detracts from a finding that they are co-owners.

Defendants argue that the investors are not co-owners because Chilcott retained control of the CFF's operations. As mentioned above, however, management of a partnership may be vested in a single part-

ner. The agreement between the investors and Chilcott placed control of the CFF in Chilcott as the managing agent. The fact that investors did not believe the CFF was, or is, a partnership is not determinative. As stated, if the elements of partnership are present, the label of partnership is not required, nor is its absence significant.

Defendants assert that there was no partnership because Chilcott denied investors access to the CFF's books and records. The investors' right of access to records was expressly stated in the investment agreements signed by them and by Chilcott. Any efforts by Chilcott to prevent detection of his wrongdoing by not allowing investors to see the CFF books cannot negate the existence of this partnership element. Investors had an enforceable legal right to examine the records and could have required Chilcott to open them for inspection.

Finally, the element that all partners must consent before a new partner may join the partnership was not present in the arrangement under scrutiny. Chilcott, unilaterally, had and exercised the power to determine who entered the CFF as an investor. Eventually he required a minimum CFF investment to remain in the CFF. Solicitations to join the CFF were in large part prompted by Chilcott's discovery, from time to time, that a particular prospective investor was laden with money ripe for the plucking. His decisions to terminate various investors' CFF participation frequently were prompted by the investors' asking him too many probing questions. As a practical matter, investors entered or left the CFF at Chilcott's sole discretion, but there was no agreement by the CFF investors delegating that power to Chilcott.

■ In summary, I find and conclude that while the CFF had some requisite characteristics of a partnership, it did not have them all, and therefore it was not and is not a partnership under Colorado law.

### B. Unincorporated Association.

Next to be considered is whether, under Colorado law, the CFF is, or was, an unin-

corporated association with capacity to sue. The elements of an unincorporated association with capacity to sue are not defined by statute.

An instructive case on this purely state law question is *Hidden Lake Development Co. v. District Court*, 183 Colo. 168, 515 P.2d 632 (1973). There an association of neighboring landowners sued to set aside the rezoning of certain land. After the statutory time limitation for seeking review of the county commissioners' rezoning decision had passed, two individual landowners were substituted as plaintiffs. The two new plaintiffs attempted to adopt the association's petition and to take advantage of its timely filing date. The Colorado Supreme Court held that the association was not an entity with capacity to sue, and therefore, its petition and timely filing could not be adopted by the new plaintiffs. *Id.* at 515 P.2d 632, 634. The court declared:

> "Rule 17 is procedural, providing how a legally constituted entity may bring its action; it does not however, grant the right to sue to a loosely formed group. The status of an unincorporated association must be founded on more than a bald allegation. To sue as an unincorporated association in name only is insufficient. Such legal entity must in fact exist. Colorado has no statutes pertaining to such associations, so the common law must govern their existence. It is *usually* characterized by having by-laws governing its organization and operation, a stated purpose for its existence, and providing for its continuity though its membership may change. There should also be responsible officers elected according to the by-laws, whose duties and responsibilities may be ascertained and

upon whom valid process may be had." *Id.* at 515 P.2d 632, 634–35. (emphasis added) (citations omitted).

Here the CFF had no by-laws. There was, however, a very specific printed original investment agreement which governed the CFF no later than 1980 and an amended investment agreement effective April, 1981. Chilcott's frequent and blatant violation of those agreements does not render them ineffective to establish an unincorporated association.

The provisions of the original agreements and the amended agreement clearly meet and exceed the criteria described in *Hidden Lake* for establishment of a legally constituted entity.

The original agreement, a three-page investment document, expressly recognizes the CFF as a common investment fund.[1] Although no officers were elected as mentioned in *Hidden Lake* the agreement provided for a managing agent. It further provided that investors make capital contributions to this entity or fund.

Another element of the *Hidden Lake* criteria is met by a statement in the original agreement of a purpose for the entity's existence. Each investor agreed that the "principal purpose" was "to invest in the commodity and stock markets" through the CFF and to have the investments managed in the sole and complete discretion of the managing agent. The managing agent's duties were spelled out in detail and a management fee was provided.

The original agreement also established procedures for individual investors to "cash-out" of the CFF. The CFF retained its continuity though its membership was

---

1. The investment agreement expressly provides, in part, as follows:

"THIS AGREEMENT, made and entered into this ____ day of _____, among THOMAS D. CHILCOTT, hereinafter called 'Managing Agent,', [and _____], hereinafter called 'Investor'.

WHEREAS, the Investor has agreed to make contributions to a common investment fund, hereinafter called the 'investment fund', and

WHEREAS, said investment fund is established for the purpose of trading in the commodities and stock market exclusively, and

WHEREAS, the Investor is desirous of obtaining management services and investment advice from the Managing Agent and said Agent has agreed to render said services and manage the investment fund."

fluid, thus meeting another *Hidden Lake* criterion.

In the "Amendment to Investment Agreement" the investors reinforced the CFF's legal status by expressly confirming their intent to participate in a commodities pool. The amended agreement was prompted by a CFF reorganization and a desire to conform with CFTC commodity pool operator regulations. The name "Chilcott Futures Fund" was formally adopted in connection with this reorganization.

The investors acknowledged in the amended agreement that they were investors in a continuing entity known as a commodity pool operated by a pool "operator" or an affiliated company, Chilcott Portfolio Management, Inc. (CPMI). Paragraph one of the amendment contains a clause stating that the purpose of the CFF is "to trade, buy, sell, spread or otherwise acquire, hold or dispose of commodity futures contracts . . . . [T]he objective of the Fund is appreciation of its assets through speculative trading and the receipt of interest and earnings thereon." The amended agreement establishes a principal place of business for the CFF at the CPMI offices in Ft. Collins.

The investors' ownership interests in the CFF received further clarification in the amended agreement. Investors owned "units" in the CFF with each unit valued at $1,000. The amended agreement went on to define the pool operator's powers and responsibilities, to refine management procedures, and to confirm prior profit distribution practices.

I find and conclude that the CFF meets the *Hidden Lake* standards and at all material times, both before and after the name Chilcott Futures Fund was officially adopted, the CFF was an unincorporated association having capacity to sue.[2] That finding is supported by the holding in *Heinhold Hog Market, Inc. v. McCoy,* 700 F.2d 611 (10th Cir.1983). In *Heinhold,* the Tenth Circuit addressed the question

whether the National Commodity Exchange (NCE) was a partnership or other form of unincorporated association under either federal or Colorado law. The NCE acted as a "private warehouse exchange bank" for members of a tax protestors group. Members would send federal reserve notes to the NCE for conversion into silver or gold. The NCE would convert the silver and gold back to reserve notes at a member's direction and then pay creditors designated by the member. In effect, the NCE was a bill paying service intended to conceal the paper trail of the member's financial dealings.

The NCE's structure was in many ways similar to that of the CFF. There was no principal officer of the NCE. Testimony indicated that the operator's authority and control over the NCE was absolute and irrevocable. There was no contact between members; a member acted only through the NCE as his or her sole agent.

Notwithstanding these facts, the Court of Appeals affirmed Judge Weinshienk's holding that the NCE was a partnership or other form of unincorporated association.

The CFF's procedures and governing framework are far more definite than the NCE's structure. As the court stated in *Heinhold,* "[w]henever people band together for a particular purpose, the law determines what obligations they owe one another and what rights are possessed by outsiders who deal with the organization or who have a lawful interest in a participant's property held by the organization." *Id.* at 615. It is clear from *Hidden Lake* and *Heinhold,* that Colorado state law has recognized the capacity to sue of entities far less formalized or elaborate in their structure and organization than the CFF.

Defendants argue that the CFF is a fiction because the plaintiff has not categorized some investors as CFF members even though they signed investor agreements. That argument is not determinative on the

---

2. Even if the CFF did not qualify as an unincorporated association, it has capacity to sue because it emobdies the essential characteristics of a commodity pool governed by federal commodity law and regulations.

capacity issue. It will be the plaintiff's burden at the trial on the merits to establish which individual investors became CFF members before the plaintiff will be allowed to seek damages for dissipation of those investors' funds.

Defendants further argue that no entity could have existed because there was no common intent among the investors. Defendants point out that some CFF investors believed that Chilcott was investing their money in conservative treasury bills, whereas others believed that their money was being invested in high-risk commodities.

Defendants err in focusing solely on Chilcott's fraudulent misrepresentations. It is undisputed that Chilcott painted different pictures for different investors as to the scope, profitability and performance of their supposed investments. Chilcott would represent that the CFF's funds were pooled in low risk investments if he felt that was what a prospective investor wanted to hear before he would invest. An entirely different representation might be made to the next unfortunate investor.

The focus of this inquiry is not on the flood of falsehoods unleashed by Chilcott. Rather, the concern here is with the intent of the investors to participate in an investment pool. The investors had a common intent to comingle their money for collective investment with the common purpose of reaping greater profit through pooled investment. The CFF was the vehicle for that common intent and purpose. In complex fraud cases, courts cannot allow themselves to be diverted or confused by the camouflage of details which merely sidetrack the main inquiry.

That inquiry is whether the CFF is an unincorporated association under Colorado law. It should be noted that the trend in other jurisdictions "has been the rejection of legal niceties to assure full recognition of the unincorporated association as a separate legal entity." *Barr v. United Methodist Church,* 90 Cal.App.3d 259, 153 Cal. Rptr. 322 (1979), *cert. denied* 444 U.S. 973, 100 S.Ct. 468, 62 L.Ed.2d 388 *rehearing*

*denied* 444 U.S. 1049, 100 S.Ct. 742, 62 L.Ed.2d 737 (1980).

"We must recognize that the society of today rests upon the foundation of group structures of all types, such as the corporation, the cooperative society, the public utility. Such groups must, of course, operate successfully within the society; one of the prerequisites to that functioning is generally, liability to suit and opportunity for suit. To frustrate that viability by the imposition of outmoded concepts would be to impair the institutions as well as to impede the judicial process." *Daniels v. Sanitarium Assn., Inc.,* 59 Cal.2d 602, 607–608, 30 Cal.Rptr. 828, 832, 381 P.2d 652, 656.

*See also Marshall v. International Longshoremen's & Warehousemen's Union,* 57 Cal.2d 781, 22 Cal.Rptr. 211, 371 P.2d 987 (1962).

The California courts have followed this trend by formulating a liberal definition of an unincorporated association.

"The criteria applied to determine whether an entity is an unincorporated association are no more complicated than (1) a group whose members share a common purpose, and (2) who function under a common name under circumstances where fairness requires the group be recognized as a legal entity." *Barr v. United Methodist Church,* 90 Cal.App.3d 259, 153 Cal.Rptr. 322 (1979) (holding that the United Methodist Church was an unincorporated association which could sue or be sued).

The *Barr* opinion pointed out that a variety of organizations have been held to be unincorporated associations under California law. *See Friends of Mammoth v. Board of Supervisors,* 8 Cal.3d 247, 104 Cal.Rptr. 761, 502 P.2d 1049 (1972) (environmental society); *Jardine v. Superior Court,* 213 Cal. 301, 307–08, 2 P.2d 756, 759 (1931) (stock exchange); *California State University, Hayward v. National Collegiate Athletic Assn.,* 47 Cal.App.3d 533, 121 Cal. Rptr. 85 (1975) (athletic organization); *White v. Cox,* 17 Cal.App.3d 824, 95 Cal. Rptr. 259 (1971) (condominium owners);

*Herald v. Glendale Lodge, No. 1289, B.P. O.E.,* 46 Cal.App. 325, 189 P. 329 (1920) (lodge).

A similarly liberal definition of an unincorporated association is found in *Heifetz v. Rockaway Point Volunteer Fire Department,* 124 N.Y.S.2d 257, 260 (1953) *aff'd,* 282 App.Div. 1062, 126 N.Y.S.2d 604 (1983). In *Heifetz,* an unincorporated association was defined as "an organization composed of a body of persons united without a charter for the prosecution of some common enterprise. The court held that a volunteer fire department met that definition.

In *State of Alaska v. Aleut Corporation,* 541 P.2d 730 (Alaska 1975), the court relied on the *Hidden Lake* standard to find that several native villages in the Aleutian Islands had capacity to sue. Because the villages had identifiable officers who could be held accountable for the litigation, the *Hidden Lake* standard was met.

In *Health Care Equalization Committee v. Iowa Medical Society,* 501 F.Supp. 970 (S.D.Iowa 1980) the court stated that the Iowa and federal definitions of an unincorporated association were similar and very broad. The court defined an unincorporated association as "a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise." *Id.* at 976. The court went on to hold that the plaintiff was an unincorporated association with capacity to sue merely on the basis that its common goal was the prosecution of the underlying case and it had the power to make by-laws, compensate members, and conduct activities in furtherance of its purpose. *Id.* at 976.

The federal cases follow the trend of broadly defining an unincorporated association. In *Associated Students of the University of California at Riverside v. Kleindienst,* 60 F.R.D. 65, 67 (C.D.Cal. 1973) the court stated that an unincorporated association is "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a com-

mon objective." The court held that a student body organization met that definition. The same definition was approved in *Testa v. Janssen,* 482 F.Supp. 1195 (W.D.Pa. 1980). In *Testa,* however, the court found that the defendant Wes Farrell Organization was not an unincorporated association but merely a label to identify numerous companies.

█ I find and conclude that the CFF identity was not a mere label but the name of a distinct entity. It meets the broad definition of an unincorporated association used in Colorado as well as in other jurisdictions. The CFF investors used a common name, had a common intent and purpose, signed identical documents which governed the organization, had an identifiable managing agent and had a specific set of operating procedures.

Finally, as stated in *Barr v. United Methodist Church,* 90 Cal.App.3d 259, 266, 153 Cal.Rptr. 322, 327 (1979), "[o]n a national basis, the trend continues to assure legal status to organizations where in fairness it is appropriate." Fundamental fairness requires that the CFF be recognized as having capacity to sue as an unincorporated association. If the CFF is found not to have capacity to sue, the investors' only remedy would be to bring individual suits against the defendants. At the hearing on these motions to dismiss, it was represented that 90 to 95 percent of such individual investor suits now would be time barred by applicable statutes of limitations. It is obvious that the investors have chosen to rely on this receivership action rather than to pursue separately their individual suits and therefore, have been lulled to sleep on their rights during the time this suit has been pending. Unfortunately, a substantial amount of that time was consumed by the order staying individual investor suits while this case proceeded. That stay order was eventually reversed by the Tenth Circuit Court of Appeals. *See Commodities Futures Trading Commission v. Chilcott Portfolio Management, Inc.,* 713 F.2d 1477 (10th Cir.1983). It would be grossly inequitable to dismiss this case, thus barring any

relief to most of the investors, in light of that mistaken stay order.

I find and conclude that under Colorado law the CFF is an unincorporated association with capacity to sue.

### III. *Standing.*

■ The United States Constitution, Article III, limits the jurisdiction of federal courts to "cases" and "controversies." An association may have standing if it seeks judicial relief for injuries to the association. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In other words, the association must have a "personal stake in the outcome of the controversy." *Id.* at 498–99, *quoting, Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

As this court stated in *Mountain States Legal Foundation v. City and County of Denver,* 567 F.Supp. 476, 478 (D.Colo.1983), the constitutional requirement of a personal stake in the controversy has two prongs. First, the plaintiff must show that it has suffered or will incur some injury in fact that is both distinct and palpable. *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Second, the plaintiff also must prove a "fairly traceable" causal relationship between the defendants' challenged conduct and that injury. *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

As to the first prong, the Tenth Circuit Court of Appeals elaborated on the injury in fact requirement in *Citizens Concerned for Separation of Church and State v. City and County of Denver,* 628 F.2d 1289 (10th Cir.1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981):

"[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* at 1296, *quoting Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1972).

The court went on to hold that the plaintiff had not:

"established standing to sue in its own right.... There is no contention that Citizens will suffer any economic loss or injury.... The record is devoid of any demonstrable identification of Citizens in an organizational sense which could bring it within the realm of an 'aggrieved person' suffering an invasion of a legal right." *Id.* at 1297.

Plaintiff in this case has made ample showing that the CFF incurred grievous economic loss. There is injury to the association; alleged dissipation of $50 million in CFF assets more than adequately satisfies the requirement that the injury in fact be distinct and palpable.

Similarly, as to the second personal stake prong, the injury to the CFF is fairly traceable to the challenged conduct of the defendants and the injury in fact asserted here is redressable by the claims remaining in this case.

None of the prudential considerations recognized as limitations upon standing to sue in federal court are present here. Plaintiff does not assert any "generalized grievance" or seek relief for persons or entities other than the CFF. The interests that the plaintiff seeks to vindicate are "arguably within the zone of interests to be protected or regulated" by the law governing the remaining claims. *Association of Data Processing Services Organization v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

■ I find and conclude that the plaintiff possesses standing to sue. I further find and conclude that, based on the plaintiff's capacity and standing to sue, the real-party-in-interest requirement has been met.

"Every civil action in the federal courts must, of course, be prosecuted in the name of the real party in interest. And, the 'real party in interest' is the one who, under applicable substantive law, has the legal right to bring the suit. See: *Hoeppner Construction Company v. United States,* 10 Cir., 287 F.2d 108."

*Boeing Airplane Co. v. Perry,* 322 F.2d 589, 591 (10th Cir.1963).

Accordingly,

IT IS ORDERED that the defendants' motions to dismiss are denied.

IT IS FURTHER ORDERED that the defendants shall answer the second amended complaint within twenty days.